## The State v. Grugin, Appellant.

### Division Two, November 7, 1898.

1. **Homicide**: PROVOCATION: RAPE OF DAUGHTER. Where it appeared in evidence, in a trial for murder, that defendant was informed, on the day of the homicide, at about 9 or 10 o'clock in the forenoon, that his infant daughter had been ravished by deceased, about a month previously, and that, at about 3 or 4 o'clock in the afternoon, defendant went a distance of about three miles, to the place where deceased was working, and shot and killed him, it was error to charge that the jury should find defendant guilty of murder, on finding such facts, and that such act was committed by defendant in consequence of anger engendered by such report of the rape of his daughter, and of his belief of such report, as the effect of such evidence to reduce the grade of defendant's crime from murder to manslaughter should have been submitted to the jury.

2. ———: ———: COOL STATE OF BLOOD: QUESTION FOR JURY. Such instructions were also erroneous, in that they dictated to the jury, as a matter of law, what was a sufficient provocation for the act of defendant, and what was a sufficient cooling time for the passion excited by the information communicated to him, which were questions for the jury.

3. ———: ———: COMMENTING ON EVIDENCE. Such instructions were also objectionable as commenting on the evidence.

4. ———: ———: DELIBERATION: EXCITEMENT: AGITATION. Instructions that mere excitement or agitation does not destroy the element of deliberation in murder in the first degree, and that, in passing on defendant's motives and intentions, and the reasonableness and good faith thereof, the jury should take into consideration any agitation and excitement, if such were shown, were inconsistent, and calculated to mislead.

5. ———: USE OF WORDS "BRUTALITY" AND "ATROCITY." Where there were no "indications of brutality and atrocity" attending a homicide, unless a homicide effected by means of a shotgun, at close range, is necessarily brutal and atrocious, the use of such terms in an instruction was erroneous.

State v. Grugin.

6. ———: REASONABLE PROVOCATION: WORDS.    Where defendant, who
had been informed that his infant daughter had been ravished by
his son-in-law, while on a visit to him and her sister, called on
the perpetrator of the outrage, and inquired of him why he had
done so, and, on receiving the insolent and defiant reply, "I'll do
as I damn please about it," shot and killed him, the question whether
such words constituted a reasonable provocation should have been
left to the jury, with an instruction that, if they should so find,
then defendant was guilty of no higher offense than manslaughter
in the fourth degree.

7. ———: FELONY OF DECEASED: DEFENDANT'S RIGHT TO ARREST HIM:
INSTRUCTION.    Defendant, on being informed that his infant daugh-
ter had been ravished by deceased, went to see the latter, with the
avowed purpose of placing him under arrest, and, on receiving an
insolent and defiant reply to a question respecting such criminal
conduct, shot and killed him.   On the trial of defendant for murder,
the "previously chaste character" of his daughter having been
shown, an instruction, on his behalf that, if the jury believed from
the evidence that deceased had intercourse with such daughter at
the time in question, and that she was then unmarried, of previ-
ously chaste character, and under the age of eighteen years, then
deceased was guilty of a felony, even though they should find that
she consented to such intercourse, was refused. *Held*, that such
instruction should have been given, with the addition that, if de-
ceased had committed such deed, then defendant, having probable
ground to suspect him of being guilty, had the right to arrest him,
as his right to be there for such purpose, if he went in good faith
to arrest him, was not affected by the fact that he shot deceased in
hot blood, because of his aggravating language. (GANTT, P. J.,
dissenting.)

*Appeal from Macon Circuit Court.*—HON. ANDREW
ELLISON, Judge.

REVERSED AND REMANDED.

BEN ELI GUTHRIE, DYSART & MITCHELL and BEN.
FRANKLIN for appellant.

(1)   The court takes the view and declares to the jury
that excitement and agitation in the mind of the defendant
and a heated state of the blood produced by lawful provo-
cation, could only be considered in reducing the homicide

from murder in the first degree to that of murder in the second degree. If such facts and state of mind existed, as assumed in the instruction, they should have been considered as reducing the offense to one of the degrees of manslaughter, if not a justification. Heat of blood, resulting from lawful provocation, excludes the idea of murder. (2) The instructions of the court broadly amount to this: That if the defendant, armed with a shotgun, went to the field of Hadley, and there shot and killed him, he was guilty of murder, notwithstanding the jury might believe all the other facts and circumstances shown in evidence; and this, whether defendant was sane or insane, capable or not capable of premeditation and deliberation; capable or not capable of distinguishing between right and wrong; capable or not capable of recognizing the right and wrong of his act and the consequence thereof; and whether or not the deceased was threatening and about to assault defendant and disarm him, and the defendant believed and had reasonable ground to believe from all the facts and circumstances shown in evidence that deceased intended and was about to inflict upon him some great bodily harm. These are facts which, if proven, go in defense, and not to reduce the grade of crime. (3) The defendant submits that the facts in this case tend to show that the defendant was either guilty of murder in the first degree, or that the killing was justifiable or excusable, and hence there was no case for an instruction on the second degree of murder. (4) Had Hadley been caught by Grugin in the assault and Grugin had shot and killed him, then there can be no doubt that he would not have been guilty of murder in either degree. His passion produced by the facts before him would have relieved him from the guilt of murder. But on defendant's theory at the time of the shooting Hadley affirmed the fact and hurled defiance at the defendant, that is, confessed the act and declared he would do it again. What difference

State v. Grugin.

can there be in effect on the mind between catching in the act and a defiant confession with threat of repetition? None. The latter case is worse than the former. It is more than exasperating, more humiliating and more defiant. Then take this in connection with the state of mind and the strain of the defendant at the time of this defiant confession and its possibilities upon his mind and feelings and will are beyond a definition in legal phraseology; and that condition alone is a matter of fact and should be submitted to and determined by a jury under the broadest possible instruction. State v. Taylor, 44 S. W. Rep. 785.

EDWARD C. CROW, Attorney-General, SAM B. JEFFRIES, Assistant Attorney-General, and W. W. GRAVES for the State.

(1) What facts will justify an assault is a question of law, which should not be submitted to the jury. State v. Hickman, 95 Mo. 322. (2) Neither is there evidence upon which to justify or require the giving of an instruction upon manslaughter in the fourth degree. The defendant's evidence was an attempt to show self-defense, but was even a failure on that line. State v. Jones, 74 Mo. 441; State v. Dunn, 80 Mo. 681; State v. Sansone, 116 Mo. 1; State v. Bulling, 105 Mo. 204. (3) The evidence totally fails to disclose that deceased was making any such demonstrations toward defendant that would lead defendant to believe that he was in danger, and it also fails to show that defendant did, in fact, believe himself to be in danger at that time. The evidence further fails to disclose any fact from which it could be concluded that defendant acted in a sudden heat of passion.

SHERWOOD, J.—The appeal in this instance is taken by defendant from the judgment of the trial court, which, based on the verdict of the jury, adjudged and sentenced

him to the penitentiary for the term of fifteen years as punishment for the crime of murder in the second degree.

The indictment was for murder in the first degree. There had been a mistrial, at the end of which defendant was admitted to bail in the sum of $5,000.

Briefly told, the substance and general outline of the evidence is this: Jeff Hadley who was killed on the sixth of May, 1896, had about a year prior to that date, induced Louella, one of the daughters of defendant, to run away with him and get married. This was done after defendant, not liking the bad habits Hadley had, forbade him to visit his house. These circumstances naturally produced bad blood between the parties, and gave rise to reciprocal threats being made by them; defendant on the occasion of the daughter being carried away by Hadley and married, remarking: "It looks like I ought to take my gun and go kill him" or words to that effect. On his part, Hadley was not backward in making threats respecting his recalcitrant father-in-law, by exhibiting a knife and revolver and inquiring how they would do for "Old Seal?" etc., etc. These threats of Hadley's had been told to defendant.

Time went on, however, and occasionally Louella would visit her old home, and on perhaps two occasions her husband accompanied her, and on one occasion, she visited the house of her father, the Sunday before the homicide, which occurred on Wednesday, and took dinner there.

Defendant had also visited his daughter, perhaps once or twice, and taken a meal or two with her, her husband being present. The families lived something over two miles apart, and both were by no means in affluent circumstances. Defendant owned, and lived on, a little place of his own, and Hadley had rented a forty of his wife's brother-in-law, who lived also on the same place and about a quarter of a mile distant. Defendant was about fifty years old, had been twice married, and of the first marriage there had resulted

several children, all of them daughters and married except two, Caroline and Alma who lived at home, and a son who was about grown and also unmarried remained with his father, assisting in working the little farm.

Alma was sixteen years old in April, 1896. On the afternoon of the eighth or ninth of that month she went to the house of her brother-in-law Hadley and remained with him and her sister over night. It is alleged that during the night he ravished her. On her return home the next day she had evidently been weeping, and her sister Caroline, with whom she slept, frequently would be awakened nights by her sister's crying, and finding her weeping would ask what was the matter, when she, without reply and still weeping, would turn her face to the wall. This continued for several weeks. On the Sunday next before Wednesday, May 6, 1896, Alma, who was not permitted to meet George Stephens, her betrothed, at her father's, met him at R. S. Tate's, her mother's father, and there without grossness she imparted to him the secret of her said story. Receiving this information, Stephens conveyed it the same day to Dan Tate and John Tate, the uncles of Alma, and also to Ransford, her brother. By Wednesday morning following, the information of the matter had reached the ears of R. S. Tate, the grandfather, who came down to the field on his place where Stephens was at work, and there, at his request, Stephens told what he had heard to the grandfather, and to Web Morse who was with the latter. Tate, the grandfather, not being on good terms with defendant, and thinking it best he should be informed of the matter in hand, asked Morse to go over to Grugin, who was something about three quarters distant at work in his field, and tell him about it. Morse accordingly taking with him Ancil Milan as Tate asked him, went and delivered the message of old man Tate. Morse speaking of this message to Grugin, said: "I told Mr. Grugin that the report was that Jeff Hadley had

ravished his girl about four weeks ago up at his house; that we didn't know whether he knew it or not and that Mr. Tate wanted me to tell him." It was about 9 o'clock in the morning when this message was delivered. Morse states that its delivery "seemed to hurt defendant dreadfully." "He wanted to know how I got it. I says: Your son knows it and my boy knows it, and he said: My son? You fellows stay here and I will go and see my boy. The boy was out of sight over the hill." When defendant reached the place where his son was plowing, and asked him about the truth of the report, his son replied: "Pa, it must be so." Receiving this answer defendant, greatly agitated, told his son to "turn out: that *our family is ruined."* Proceeding with his story, Morse says: "He went over and directly he came back. Tears were running down his eyes, and he was terribly red in the face. He was crying. He says: 'Boys, it is so. Ransford says it is so and,' he says, 'I'll take my shotgun and go and kill him." Then we tried to pacify him, but it didn't seem to do very much good. After he said he would kill him we told him that he hadn't better do it; that the thing was not positive. I told him it was not proof— it was not proven that it was so yet. I says: How will you find out? He says: 'I will go to the house and Caroline will tell me.' " Leaving the field where Morse was between 10 and 11 o'clock, defendant went up to his house to see his daughter Caroline, and Morse returned to old man Tate and told him he had delivered his message. Defendant on reaching his house about 11 o'clock, spoke to Caroline and requested her to ask Alma if the report about Hadley and herself was true, when she replied it was, and Alma, a few minutes afterwards, reaffirmed the same thing to her father. Her father at that time was excited and crying, and Caroline being prostrated with the excitement incident to such an occasion, her father was occupied the most of the time until noon in taking care of her.

About that time Gordon came, and defendant having an engagement had to assist him in setting up a corn-planter, and dinner had to be prepared for him. Not much dinner, it seems, was eaten by that stricken household.

When Milan left between 10 and 11 o'clock, in order to tell Tate that his message had been delivered, he promised to come by on his return home and see defendant. He did so, arriving sometime after the noon hour. On Milan's arrival, he told defendant that as Hadley might get the news of the discovery of his crime, he might get away, and advised defendant that he had better go and get him and turn him over to the officers. Having no doubt now, as defendant states, of Hadley's guilt, and fearing he would escape as suggested by Milan, defendant says: "I thought I would go up there and see Mr. Hadley and take charge of him, until I could get an officer." With this end in view, defendant took his double-barrel shotgun and four shells loaded with ordinary shot, and started to the place where Hadley lived. He arrived there about 3 o'clock in the afternoon, saw Hadley at work in the field planting corn, spoke to his daughter Louella, as he crossed the fence, and approaching Hadley, and when within a few feet of him, said: *"Jeff, what ever possessed you to rape Alma, my daughter?"* Hadley replied,*"I will do as I damn please about it!"* Defendant says that as Hadley made this insolent reply; "He pitched forward as though he was coming at me—coming to me. I had my gun on my shoulder at that time and when he made his spring forward I pulled my gun off my shoulder and shot him. I then started home; from where I was standing in my tracks here I would pass close up, probably three or four feet; I don't know exactly. As I passed him, I don't know the cause of it, but I shot him the second time, but why I made the second shot, I don't know; but I did it, and I walked straight towards home. I then met Jenson and his wife and the woman hallooed at me and wanted to

know why I had shot Jeff. I says: "He has raped one of my daughters, but he will not rape another one. Then I walked straight on down the road."

This history of the tragedy is as succinct a statement as I could make of the facts embodied in this voluminous record. Of course, I have not deemed it necessary to recount the various items of testimony touching what defendant is alleged to have said both before he took up his shotgun and started on his errand and after he had surrendered himself and was lodged in jail, tending to show that his purpose was other than that he testified to as above stated. His story not being an unreasonable one, not stamped with improbability, he was entitled to have the theory which it embodied presented to the jury by appropriate instructions, and speaking about instructions, the court at the request of the State, gave twenty, covering almost six pages of closely printed matter. At the request of defendant, the court gave nine instructions, modifying two of them. Defendant then asked another instruction which the court gave with a modification; thereupon defendant asked the court to *modify that modification.* This being refused, defendant asked the court to give seventeen *other* instructions covering six more closely printed pages. Judging by this record, and the immense *acreage* of the instructions asked, given, modified and refused, the trial judge must have had his patience sorely tried. I do not intend to encumber our reports with them, lest by so doing, I encourage and foster an imitation of their vastness and "damnable iteration." In discussing them I shall only refer to such as especially require comment. And in passing, it is well enough to say that the instructions which begin the long series given on request of the State are in usual and appropriate form and correctly, in connection with others, lay down the definition of murder in the first and second degrees. Omitting any discussion of the instructions at the present, the subject will

be recurred to hereafter. The salient topics which this record presents and on which our attention will be centered, are these:

*First,* did the outrage perpetrated by Hadley on his young sister-in-law Alma, defendant's daughter, authorize and require a submission to the jury of the question whether defendant's shooting Hadley, was done in "hot blood" and therefore only manslaughter?

*Second,* did the insolent and defiant reply of Hadley when questioned by defendant as to the vile deed he has done to the latter's daughter, authorize and require a submission to the jury of the question whether the words used by Hadley were such as to generate a sufficient or reasonable provocation so as to produce hot blood, and thus lower the grade of the homicide in either degree to manslaughter?

*Third,* whether certain instructions given at the instance of the State should have been refused?

*Fourth,* whether a certain instruction asked by defendant should have been given either as asked or in a modified form?

1. In discussing the first question propounded, we are necessarily brought into contact with that line of cases which treat of "hot blood" and how it may be engendered. Among other familiar instances furnished by the books are those where a husband finds a man in the act of adultery with his wife and immediately kills him or her, that is accounted but manslaughter, and it is the lowest degree of that offense; and therefore in such a case the court directed the burning in the hand to be gently inflicted, because there could not be a greater provocation. [Sir T. RAYM, 212.]

According to the old books such discovery of the wife's adultery must have been made in the *very act,* and the killing must have been done *"directly on the spot"* in order to reduce the homicide to manslaughter. [4 Black Com. 191; 3 Greenl. Ev. (14 Ed.), sec. 122.] The husband must have

*"ocular inspection of the act and only then."*    [Pearson's Case, 2 Lew. 216; 1 Hale, P. C. 487.]

But since the law, as other sciences, makes progress, it is no longer accounted necessary that a husband should have *"ocular inspection,"* etc. It suffices if the provocation be so recent and so strong that the husband could not be considered at the time master of his own understanding. [State v. Holme, 54 Mo. 153.] In the case just cited, the case of Maher v. People, 10 Mich. 212, was approved, the facts in that case having been these: "The prisoner offered evidence tending to show the commission of adultery by H. with the prisoner's wife. Within half an hour before the assault, the proof showed that the prisoner saw them going into the woods together under circumstances calculated strongly to impress upon his mind the belief of an adulterous purpose; that he followed after them to the woods; that they were seen not long after coming from the woods, and that the prisoner followed on in hot pursuit, and was informed on the way that they had committed adultery the day before; that he followed H. into a saloon in a state of excitement, and there committed the assault. The court held, that the evidence was proper as from it, it would have been competent for the jury to find that the act was committed in consequence of the passion excited by the provocation, and in a state of mind which would have given to the homicide had death ensued, the character of manslaughter only. The evidence showed, that the prisoner in following H. from the woods was laboring under great excitement, that, when a friend told him on the way what had happened the day before, his passion was increased and that, when he arrived at the saloon, the perspiration had broken out all over his face." And in that case it was ruled that the question as to what is an adequate or reasonable provocation, is one of fact for the jury, and so also is the question whether a

VOL. 147 mo—4

reasonable time had elapsed for the passion to cool, and reason to resume its control.

And in Maher's case it is said: "To the question, what shall be considered in law a reasonable or adequate provocation for such a state of mind, so as to give to a homicide, committed under its influence, the character of manslaughter; on principle, the answer, as a general rule, must be, anything the natural tendency of which would be to produce such a state of mind in ordinary men, and which the jury are satisfied did produce it in the case before them. . . . . It is doubtless, in one sense, the province of the court to define what, in law, will constitute a reasonable or adequate provocation, but not, I think, in ordinary cases, to determine whether the provocation proved in the particular case is sufficient or reasonable. This is essentially a question of fact, and to be decided with reference to the peculiar fact of each particular case. As a general rule, the court, after informing the jury to what extent the passions must be aroused and reason obscured to render the homicide manslaughter, should inform them that the provocation must be one, the tendency of which would be to produce such a degree of excitement and disturbance in the minds of ordinary men; and if they should find such provocation from the facts proved, and should further find that it did produce that effect in the particular instance, and that the homicide was the result of such provocation, it would give it the character of manslaughter. . . . . The law can not justly assume, by the light of past decisions, to catalogue all the various facts and combinations of facts which shall be held to constitute reasonable or adequate provocation. Scarcely two past cases can be found which are identical in all their circumstances; and there is no reason to hope for greater uniformity in future. Provocations will be given without reference to any previous model, and the passions they excite will not consult the precedents. The same principles

which govern, as to the extent to which the passions must be excited and reason disturbed, apply with equal force to the time during which its continuance may be recognized as a ground for mitigating the homicide to the degree of manslaughter, or, in other words, to the question of cooling time. . . . . The passion excited by a blow received in a sudden quarrel, though perhaps equally violent for the moment, would be likely much sooner to subside than if aroused by a rape committed upon a sister or a daughter, or the discovery of an adulterous intercourse with a wife; and no two cases of the latter kind would be likely to be identical in all their circumstances of provocation. No precise time, therefore, *in hours or minutes,* can be laid down by the court, as a rule of law, within which the passions must be held to have subsided and reason to have resumed its control, without setting at defiance the laws of man's nature, and ignoring the very principle on which provocation and passion are allowed to be shown, at all, in mitigation of the offense. The question is one of reasonable time, depending upon all the circumstances of the particular case; and where the law has not defined, and can not without gross injustice, define the precise time which shall be deemed reasonable, as it has with respect to notice of the dishonor of commercial paper. In such case, where the law has defined what shall be reasonable time, the facts being found by the jury, is one of law for the court; but in all other cases it is a question of fact for the jury; and the court can not take it from the jury by assuming to decide it as a question of law, without confounding the respective provinces of the court and jury." See, also, Rex v. Lynch, 5 C. & P. 324; Rex v. Hayward, 6 C. & P. 157; State v. Norris, 1 Hayw. marg. p. 429; Starkie Ev. [Ed. 1860], star pp. 768, 769.

In Cheek v. State, 35 Ind. 492, it was ruled on a trial for murder, it is error to exclude evidence tending to show that the person killed by the defendant had entered into a

combination with a third person to induce the defendant's wife to elope with such third person and leave her husband and children, and that the facts tending to prove such combination, of late date, had come to the knowledge of the defendant. The court remarking: "There was some evidence given, and much more offered, but rejected by the court, tending to prove that the deceased, who was the father of the defendant's wife, was and had been in an unnatural combination with one Clem, to induce the defendant's wife to leave him and elope with Clem. This evidence so far as the acts, sayings, and doings of Harrison, of a late date, had been communicated, or come to the knowledge of the defendant, should have been admitted. This evidence would have tended to show the state of Cheek's mind, and a reason for his being so highly frenzied upon his meeting the deceased, as testified to by Dr. Kyle."

Commenting on the subject of the "Adequacy of the Cause of Excitement," Bishop remarks: "The Doctrine.— Under this head, appearing as it does in the books in illustrations rather than in rules, hardly admits of reduction to rule. Not attempting an impossible exactness, we may deem it in a general way to be that the law accepts human nature as God has made it, or as it manifests itself in the ordinary man, and every sort of conduct in others which commonly does in fact so excite the passions of the mass of men as practically to enthrall their reason, the law holds to be adequate cause." [2 Bishop's New Cr. Law, sec. 701.]

Touching the subject of cooling time, Wharton observes: "Of course, hot blood could continue to exist, even after a day's delay, but this, which would sustain a conviction of manslaughter, is very different from a defense of excusable homicide, ending in an acquittal." [1 Whart. Crim. Law (10 Ed.), sec. 496.]

Elsewhere, the same author when discussing the point in hand, says: "Men's temperaments, also, vary greatly as

to the duration of hot blood; and it must be remembered that we must determine the question of malice in each case, not by the standard of an ideal 'reasonable man,' but by that of the party to whom the malice is imputed. A man may be chargeable with negligence in not duly weighing circumstances which would have checked his passion, or which, when his passion was aroused, would have caused it more speedily to subside. But he is not chargeable with malice, when he was acting wildly and in hot blood. Hence, whether there has been cooling time, so as to impute to the defendant malice, is to be decided, not by an absolute rule, but by the conditions of each case." [Ib., sec. 480.]

In Biggs v. State, 29 Ga. 723, Parish had entered the bedchamber of Biggs, and insulted his wife by a personal indignity and by words. Biggs permitted Parish to escape, with threats of punishment should he remain in the city. The next morning the would-be seducer appeared at the hotel breakfast table, and brazenly seated himself within two chairs of his intended victim, whereupon Biggs shot at, but unfortunately missed him. Being indicted and tried for an assault with intent to murder, the trial court refused to admit evidence of what transpired in the bedchamber the night before, and this upon the theory that sufficient time had elapsed for passion to subside, and for reason to resume her sway. But this refusal was held error, LUMPKIN, J., saying: "To shut out the scene which transpired in the bedchamber, is to deprive the jury of the power of appreciating the transport of passion kindled in the bosom of Biggs, by the presence of Parish."

In this connection it must not be forgotten what a high estimate the men of all nations have placed on the chastity of their women and on the inviolability of their persons. Some of the fiercest tumults and wars have had their origin in assaults made on the modesty or honor of women. Notwithstanding this, the law as yet has made no

provision and provided no punishment, for many such instances; nay more, a brother who detected a man in the act of adultery with his sister and thereupon stabbed him to death, was, by the supreme court of Pennsylvania, adjudged guilty of murder. [Lynch v. Com., 77 Pa. St. 205.]

Lord MACAULAY in his "Report on the Indian Code," very forcibly points out the gross injustice of accounting a husband who slays an adulterer, found with his wife, only guilty of manslaughter, and yet holds a high-spirited brother who in a paroxysm of rage kills the seducer of his sister, guilty of *murder*. Proceeding further, Lord MACAULAY says: "There is another class of provocations which Mr. LIVINGSTON does not allow to be adequate *in law*, but which have been, and while human nature remains unaltered, will be, adequate *in fact* to produce the most tremendous effects. Suppose a person to take indecent liberties with a modest female, in the presence of her father, her brother, her husband, or her lover, such an assault might have no tendency to cause *pain or danger*; yet history tells us what effects have followed from such assaults. Such an assault produced the Sicilian Vespers. Such an assault called forth the memorable blow of Wat Tyler. It is difficult to conceive any class of cases in which the intemperance of anger ought to be treated with greater lenity. So far, indeed, should we be from ranking a man who acted like Tyler with murderers, that we conceive that a judge would exercise a sound discretion in sentencing such a man to the lowest punishment fixed by the law for manslaughter."

When testifying before the "Homicide Amendment Committee," in 1874, BLACKBURN, J., said: "Supposing a man is actually keeping company with a young woman; she can not be called his sister or his ward, or even under his protection; and suppose a ruffian steps forward, and in the presence of the other, pulls up her petticoats, and catches hold of her, and the other struck him down, and the man

State v. Grugin.

died. That case was before Mr. Justice PATTISON, at York; somehow or other the jury and Mr. Justice PATTISON contrived to acquit him altogether. I think that was provocation that would reduce it to manslaughter."

If, as Bishop states, the "law accepts human nature as God has made it, or as it manifests itself in the ordinary man, and every sort of conduct in others which commonly does in fact so excite the passions of the mass of men as practically to enthrall their reason, the law holds to be adequate cause," I do not see how defendant is to be denied the benefit of that theory in the painful circumstances of the present case. To him, in contemplation of law, the foul wrong done his child, though not revealed to him until the morning of the day of the homicide, was as fresh and potent to stir his blood as if done on that very morning. If this be the case, then the law, while it softens the punishment of a husband who slays an adulterer found in his bed, surely can not be so illogical as to deny a like result to a father who slays the ravisher of his young daughter. Indeed it might well be said that in the latter case there should be greater lenity shown by the law than in the former, because the wife has been a consenting party to the homicide-producing adultery. The trial court while it admitted the evidence which preceded the killing, yet by its instructions denied that such evidence had any effect to lower the grade of defendant's crime from either degree of murder to manslaughter. *If the evidence referred to, was to be denied any effect, then it should not have been admitted.* The instructions for the State under review, were also erroneous in that they dictated to the jury as a matter of law, what was a sufficient or reasonable provocation, and what a sufficient cooling time. They were also guilty of the serious fault, prohibited by the statutes and condemned by numerous decisions of this court, that of commenting on the evidence, to wit, by stating to the jury that "if the jury find that such information was

brought to Grugin on the forenoon of said day, and on the afternoon of said day, about three or four o'clock, Grugin shot and killed Hadley because of this report, and his belief of it, to wit, that his daughter had been raped, then they will find defendant guilty of murder."

Again, the instruction is given, "that if they believe from the evidence that Grugin was informed that Hadley had ravished his daughter about one month before, and that information came to Grugin about nine or ten o'clock in the forenoon, and that in the afternoon Grugin went a distance of about three miles and shot and killed Hadley in his corn field at work because of his (Grugin's) anger on account of said rape and his belief that said rape had occurred, then the jury should find the defendant guilty of murder," etc. These comments on this point occur some four or five times. Such comments are sufficient of themselves to cause a reversal.

The tenth instruction given on behalf of the State told the jury, "that under the law mere excitement or agitation do not, of themselves and alone, destroy the element of deliberation in murder in the first degree," etc., while the ninth instruction given on defendant's request told the jury, "that in passing upon the defendant's motives, intentions and purposes, and the reasonableness and good faith of the same, they should take into consideration any agitation and excitement of mind and feelings, if any such were shown, as well as all other facts and circumstances shown in evidence." These two instructions can not be reconciled and were well calculated to mislead the jury, and if the prior positions taken in his opinion are correct, then the tenth instruction aforesaid is not the law.

The fifth instruction is wrong, because there were no "indications or brutality and atrocity" in the commission of the homicide, unless it can be said that homicide done *by*

*means of a shotgun at close range, is necessarily brutal and atrocious.*

2. The second interrogatory is next for consideration. It embodies and comprehends the question whether *words* constitute a sufficient or reasonable provocation in law? Of course the books abound in utterance of the platitude that words however opprobrious constitute no provocation in law. Speaking as the organ of this court I have often uttered this platitude myself, but the statement is subject to many qualifications. The general good sense of mankind has in some instances so far qualified the rigor of what is termed the ancient rule that a statute has been passed in Texas which reduces a homicide to manslaughter where insulting words are used to or concerning a female relative, the killing is reduced to manslaughter where it occurs as soon as the parties meet after the knowledge of the insult. [9 Am. and Eng. Ency. of Law, 581.]

In Alabama, a statute provides that opprobrious words shall in some circumstances justify an assault and battery. [Riddle v. State, 49 Ala. 389.] And in that State, without any statutory provision on the subject, it has been determined that *"insult by mere words,"* when the defendant acts on them and he has not provoked them, may be weighed by the jury with other evidence in determining whether the killing was murder in the first or second degree. [Watson v. State, 82 Ala. 10.]

After speaking of Morley's Case, HALE says: "Many, who were of opinion, that bare words of slighting, disdain, or contumely would not of themselves make such a provocation as to lessen the crime into manslaughter, yet were of this opinion, that if A. gives indecent language to B., and B. thereupon strikes A., but not mortally; and then A. strikes B. again, and then B. kills A. that this is but manslaughter. For the second stroke made a new provocation, and so it was but a sudden falling out; and though B. gave the first stroke,

and after a blow received from A., B. gives him a mortal stroke, this is but manslaughter, according to the proverb, the second blow makes the affray. And this was the opinion of myself and some others." [1 Hale, P. C. 456.]

Now in the case HALE supposes, it is as he says the second stroke that made a "new provocation," but the second stroke was given by A. Then what made the old provocation? Evidently, the "indecent words" of A. which, given by A. to B., prompted the latter to give the first stroke. So in Morley's Case, it was agreed that "if upon ill words both of the parties suddenly fight, and one kill the other, this is but manslaughter; for it is a combat betwixt two upon a sudden heat, which is the legal description of manslaughter." [6 How. St. Tr. 771.] In that instance, also, it must be noted that "ill words" were the provocation that made the hot blood which resulted only in manslaughter: To test this matter further, suppose no "ill words" used, what then the crime? Evidently murder.

It is said in the books that though an insufficient assault or demonstration do not import coming violence, still it and insulting words combined, may so excite the passions as to reduce the killing to manslaughter. [2 Bishop's New Cr. Law, sec. 704.]

If the inchoate assault be naught as provocation, and the approbrious words be naught as provocation, I am unable to see how the addition of these two ciphers can make a unit. "The moment, however, the person is touched with apparent insolence, then the provocation is one which, ordinarily speaking, reduces the offense to manslaughter." [1 Whart. Cr. Law (10 Ed.), sec. 456.] And it is held that such "apparent insolence" may be manifested in a variety of ways, as for instance, by a contemptuous jostling on the street, by tweaking the nose, by filliping on the forhead, or by spitting in the face. In most of these instances and illustrations there is no physical pain or injury inflicted, the "sudden

*heat"* springs from the *indignity* the *insult* offered, and from nothing else. [Kelly Cr. Law, sec. 518.] This being true the law should not be so unreasonable as to deny to an *insult* offered *in words* the same force and effect which all men recognize that it has as a matter *of fact.* If it "so excite the passions of the mass of men as to enthrall their reason, the law should hold it adequate cause" for the reduction of the grade of the offense, resulting from the use of the insulting words. No sound distinction can, it seems, be taken in principle between insult offered by acts and that offered by foul and opprobrious words.

I will now refer to some adjudications where insulting words have been held a sufficient basis for a charge or an instruction on the offense of manslaughter. ' Where the prisoner was indicted for the willful murder of his wife, BLACKBURN, J., in summing up, said: As a general rule of law, no provocation of words will reduce the crime murder to that of manslaughter, but under special circumstances there may be such a provocation of words as will have that effect; for instance, if a husband suddenly hearing from his wife that she had committed adultery, and he, having no idea of such a thing before, were thereupon to kill his wife, it might be manslaughter. Now, in this case, words spoken by the deceased just previous to the blows inflicted by the prisoner were these: 'Aye; but I'll take no more for thee, for I will have no more children of thee. I have done it once, and I'll do it again.' Now, what you will have to consider is, would these words, which were spoken just previous to the blows, amount to such a provocation as would in an ordinary man, not in a man of violent or passionate disposition, provoke him in such a way as to justify him in striking her as the prisoner did?" [Reg. v. Rothwell, 12 Cox C. C. 145.] In that case (tried in 1871) the husband seized a pair of tongs, close at hand, and struck his wife three

State v. Grugin.

violent blows on the head from which she died within a week, and the verdict was for manslaughter.

In Reg. v. Smith, tried in 1866, a woman had left her husband and gone off and lived in adultery with one Langley. He having died, she returned to her home, and her husband forgave her, but she did not prize this forgiveness, because on the next night after her return she violently abused him, taunting him with her preference for Langley and declaring had he not died, she had not returned. Whilst this was going on, she was so violent as to have to be held by two other women who were present; her husband sat by her on the seat trying to pacify her. Finally she broke from the women who were holding her and repeating with much foul language her preference for Langley, spat towards her husband, whereupon he, who was then standing up within a yard of her, gave her a blow in the neck with a sharp pointed pocket knife, which caused her immediate death. And the jury were in substance charged: An assault, too slight in itself to be sufficient provocation to reduce murder to manslaughter, may become sufficient for that purpose, when coupled with words of *great insult*. [4 F. & F. 1066.] A verdict of guilty of manslaughter was returned.

This case arose in Tennessee. The defendant killed Jones with a deadly weapon. Jones being at defendant's house, used obscene language in the presence of defendant's family and at his table. Defendant being tried, he was convicted of murder in the second degree. The lower court held the words of the deceased however obscene, and his conduct however vexatious, · could not amount in law to reasonable and adequate provocation, and upon that view of the law, withdrew from the jury the consideration of the facts. Upon this the Supreme Court held: "It ought to have been left to the jury to determine under proper instructions, whether the obscene language of the deceased, used in the presence of the defendant's family, and at his table, in

connection with his vexatious conduct, was calculated to produce such excitement and passion, as would obscure the reason of an ordinary man, and induce him, under the excitement and passion so produced, to strike the blow, and whether in fact the blow was stricken in consequence of the heat of passion so produced. . . . Being greatly excited upon sufficient cause, he is impelled by a sudden motive of revenge, and that includes the idea of malice, whether he strikes with a deadly weapon or not. The fact that he used a deadly weapon in connection with other circumstances, may be properly looked at, in determining whether the blow was the result of the sudden passion; but when the jury are satisfied that the defendant was impelled by sudden passion, produced by sufficient provocation to strike, the simple fact of using a deadly weapon would not make the blow malicious." [Seals v. State, 3 Baxt. 466.]

In Wilson v. People, 4 Parker Cr. Rep. 619, the accused was convicted of murder in the first degree. The statutes in that State as to murder and manslaughter are the same as our own. The deceased had been struck on the head by a hatchet or some other weapon, but died, it seems, in consequence of falling into the water and drowning. The lower court had charged that the "heat of passion" meant by the statutes, could not be produced or provoked by *words of the most aggravated character.*" Commenting on this charge, WRIGHT, J., observed: "The law, respecting the infirmities of our nature, attaches a less degree of criminality to acts of violence perpetrated under an excitement provoked by the assailed. The passions may be heated as effectually by words as by acts; and an assault may be provoked oftentimes as readily by the former as the latter. In cases of assault of the person, it has always been held that provocation by words has gone far to mitigate the legal wrong. . . . . It is enough that the passions are heated by the acts or conduct of the one upon whom the assault is made,

and it matters not whether this state is produced by acts or words, if either the one or the other are naturally calculated to produce it."

So it will be seen that there *are* circumstances where *words do amount to a provocation in law,* i. e., a reasonable provocation to be submitted to the determination of the jury, and if found by them to exist, then the crime is lowered to the grade of manslaughter. If there ever was a case to which this principle should be applied, it would seem it should be applied to the case at bar. A father is informed that his young daughter just budding into womanhood has been ravished by his son-in-law, while under the supposed protection of his roof. Arriving where the son-in-law is, and making inquiry of him why he had done the foul deed, that father receives the answer, *"I'll do as I damn please about it."* This insolent and defiant reply amounted to an affirmation of Hadley's guilt! So long as human nature remains as God made it, such audacious and atrocious avowals will be met as met by defendant. It should be held, therefore, that the words in question should have been left to the jury to say whether, in the circumstances detailed in evidence, they constituted a reasonable provocation, and if so found, that then defendant was guilty of no higher offense than manslaughter in the fourth degree.

3. Relative to one of the instructions asked by defendant but refused by the court. This instruction was asked: "If the jury believe from the evidence that the deceased, Hadley, had intercourse with Alma Grugin in the year 1896, and that she was then unmarried, of previously chaste character, and under the age of 18 years, then said Hadley was guilty of a felony, and this is true, even though you may further find that she consented to such intercourse." This instruction lays down the law as announced by this court in State v. Knock, 142 Mo. 515. That Alma Grugin was of "previously chaste character," is shown by Hadley's

remark to Alma, that "you are not the first, I've broke in lots of them." The instruction should have been given with the addition that if Hadley had done the deed mentioned, then defendant having probable ground to fairly suspect him of being guilty, had the right to arrest him. [State v. Albright, 144 Mo. 638.] Such modifications or additions to complete or rectify an improper instruction are authorized by a long line of decisions of this court. [State v. Clark, page 20 of this volume.] And if defendant went in good faith to arrest Hadley, his right to be there for that purpose would not be destroyed, because he shot Hadley in hot blood because of the reply Hadley gave him.

The judgment should be reversed and the cause remanded. Burgess, J., concurs *in toto;* Gantt, P. J., does not concur as to that portion of paragraph 2 in reference to words being regarded as a reasonable provocation by either court or jury.