State v. Trujillo, 27 N. M. 594

(No. 2547.   Dec. 23, 1921.)

## STATE v. TRUJILLO.

### SYLLABUS BY THE COURT

(1)   No mere words, however opprobrious or indecent, are deemed sufficient to arouse ungovernable passion, so as to reduce a homicide from murder to manslaughter.      P. 596

(2)   The rule that the court should limit the issues to the degrees of crime shown by the evidence is the same in cases where the evidence is wholly circumstantial as where the evidence is direct.   In the former class of cases, however, where the circumstances shown are susceptible of two or more interpretations, it is for the jury, and not the court, to draw the proper inferences from the evidence.      P. 598

(3)   It is reversible error to submit, in a murder case, the issue of voluntary manslaughter to the jury where no such issue is involved in the evidence.      P. 601

Appeal from District Court, Colfax County; Leib, Judge.

Sotero Trujillo was convicted of voluntary manslaughter, and he appeals.   Reversed and remanded, with instructions.

L. S. Wilson, of Raton, for appellant.

H. S. Bowman, Atty. Gen., and A. M. Edwards, Asst. Atty. Gen., for the State.

### OPINION OF THE COURT

PARKER, J.   Appellant was indicted for the murder of one Luke Casamoff, was tried and convicted of voluntary manslaughter, and was sentenced to a term of from nine to ten years in the state penitentiary.   The case is here on appeal from that judgment.

The facts immediately surrounding the homicide are only circumstantially shown, there being no eyewitness to the tragedy.   The deceased was found in the afternoon of the 21st of December, 1919, in

his room at the side of a cot or bed with his head crushed in on the left side by a blow received from a heavy instrument. An ax covered with blood was found right near the body. There was no evidence of any struggle at the time of the homicide. Deceased's clothes were undone—that is, unbuttoned —but were not removed, and his shoes were unlaced. He had been sitting upon the edge of the bed when he received the blow, the bedclothes having been turned down preparatory to his going to bed. Several days later the appellant was arrested, and he was wearing a coat which was taken by the sheriff to a chemist and criminologist in Denver, who testified that the coat had several blood stains upon it, and that the blood stains were of human blood. Several witnesses testified to seeing the deceased and the defendant in company of each other during the night preceding the morning when the homicide must have been committed.

One witness, Ivan Ramyak, was the most satisfactory witness as to the conduct and association of the deceased and appellant on the night previous to the homicide. He testified that at about a quarter after 12 of that night he went to the house of the deceased. He there found the deceased and the appellant. He says that they were quarreling, and that the deceased told the appellant that he (the appellant) had a wife and children and that he would not work; that, after taunting the appellant with the fact that he would not work to support his family, and stating that people of deceased's nationality worked, the deceased took out of his pocket a little bag of money, and showed it to the defendant, showing a considerable sum. He says that the deceased told him (the witness) that he would give him a drink if the defendant had not been there, and that the witness then told the deceased to come over to the witness' house and that he would give him a drink, and at the same time he told appellant

to come along also. The three went to the house of the witness and remained there from a little after 1 o'clock in the morning to a quarter to 5 of the same morning, during which time they were drinking wine. The witness says the deceased and the appellant went away from his house together, and that as soon as they left the house he shut the door and did not know where they went.

The defense of the appellant was that of alibi. He testified himself, and he was supported by his wife and his mother, that he went to his own house, and went to bed at about 1 o'clock, and did not leave the house thereafter until late the following morning.

At the close of the trial, the court, over the objection of appellant, submitted to the jury the question of the guilt of the appellant of voluntary manslaughter, and the principal contention here is that in so doing the court committed error, upon the theory that there was no evidence in the case justifying a submission of that issue to the jury.

[1] The Attorney General relies, in support of the judgment, upon two propositions: (1) That there is evidence of adequate cause for heat of passion; and (2) that, as there was no direct evidence of the immediate circumstances surrounding the homicide, it was not only proper, but necessary, to submit all the degrees of unlawful homicide to the jury.

Our manslaughter statute is as follows:

"Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: 1st. Voluntary: Upon a sudden quarrel or in the heat of passion. 2nd. Involuntary: In the commission of an unlawful act not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner or without due caution and circumspection." Section 1460, Code 1915.

As before seen, appellant was convicted of volun-

State v. Trujillo, 27 N. M. 594

tary manslaughter, and consequently he must have killed deceased without malice and upon a sudden quarrel, or in the heat of passion, or the verdict was not supported by the evidence. There is absolutely no evidence in the record of a sudden quarrel. There is evidence of a quarrel some three and a half hours before deceased reached his room, where he was killed, but during that time deceased and appellant were together, and there was no quarrel between them. There is no evidence that the quarrel was ever renewed between them. The evidence likewise fails to show adequate cause for heat of passion. The most that appears is that deceased taunted appellant as being lazy and refusing to work to support his family. It is well established by the great weight of authority that no mere words, however opprobrious or indecent, are deemed sufficient to arouse ungovernable passion, so as to reduce a homicide from murder to manslaughter. 13 R. C. L. "Homicide," § 99; State v. Buffington, 71 Kan. 804, 81 Pac. 465, 4 L. R. A. (N. S.) 154. See, also, State v. Dickens, 23 N. M. 26, 29, 165 Pac. 850. In this connection we call attention to a minority doctrine recognized in England and a few states to the effect that it is the existence or nonexistence of sufficient passion, properly aroused, which is determinative; the means whereby the passion was excited being immaterial, so long as they were of a nature naturally calculated to excite such passion in the ordinary mind. Such rule is recognized by statute in Texas. See note to State v. Buffington, supra, where the cases are collected. See also State v. Grugin, 147 Mo. 39, 47 S. W. 1058, 42 L. R. A. 774, 71 Am. St. Rep. 553.

In the case at bar, however, no claim is made that heat of passion was aroused in the mind of appellant, and therefore we do not deem the question as

to the better doctrine to be properly raised here.

[2]     The Attorney General relies upon two territorial cases, and argues from them that, where the evidence as to the immediate circumstances of the homicide is entirely circumstantial, it is not only proper, but required, to submit all degrees of unlawful homicide. He cites Aguilar v. Territory, 8 N. M. 496, 46 Pac. 342, and Territory v. Padilla, 8 N. M. 510, 46 Pac. 346.

In the Aguilar Case the defendant was convicted of murder in the first degree. He appealed, and assigned as error the refusal of the court to submit to the jury second and third degree murder. The facts in that case were that the appellant was travelling from the town of Cochiti to his home in San Miguel county, and met the deceased and another on the road and traveled with them that day, camped with them that night, traveled with them until late in the afternoon of the following day, when they all stopped for dinner. After dinner they separated, the appellant going in the direction of his home. Four days later the bodies of the two fellow travelers of appellant were found dead in their wagons some miles from the place where the appellant left them. They had been beaten to death with an ax. At the time of the occurrence and the trial the statue divided murder into three degrees. Murder in the first degree was defined practically the same as it now is. Section 1459, Code 1915. All murder perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor, or in the heat of passion without design to effect death, but in a cruel and unusual manner, or by means of a dangerous weapon, was designated as murder in the second degree. Every killing by the act, procurement, or culpable negligence of another, which was not murder in the first or second degree, as defined in the statute, was declared to be

murder in the third degree. See sections 1063, 1064, 1065, C. L. 1897. The question in that case was whether the proof that the deceased was found in his wagon beaten to death with an ax showed conclusively murder in the first degree, or whether it only showed killing with malice aforethought, and hence required the submission of second degree murder. The court held there was error in failing to submit to the jury second degree murder. There are expressions in the opinion to the effect that, where the evidence is circumstantial, all three degrees of murder should be submitted to the jury, but the court did not so decide, and simply held that under the facts shown in evidence it was only necessary to submit murder in the first and second degree.

In the Padilla Case, supra, the circumstances were a little more directly shown, but the evidence as to the facts immediately surrounding the killing was entirely circumstantial, and the killing was accomplished by shooting. Otherwise the facts are quite similar to the Aguilar Case. The court held that in that state of the proof it was error to confine the issue to first degree murder, and that second degree murder should have been submitted. The court said:

"There is no question but that a verdict of murder in the first degree would be supported by the evidence that defendant was hostile to deceased, that he followed after him with a gun, that a shot was heard, and the deceased was killed from the effect of a bullet in his body, as there would be circumstances tending to show deliberation and premeditation; but, before arriving at such a verdict, it was necessary for the jury to believe beyond a reasonable doubt that no sudden quarrel arose, and that deceased was (not) killed in the heat of passion, without design to effect death, or that defendant did not kill deceased in any other of the ways constituting murder in the second degree, and that it was not done by the culpable negligence of defendant, and it was not

done under such circumstances as constitute excusable or justifiable homicide. * * *"

The court further says:

"The cardinal distinction between all homicides not shown by eyewitnesses, and homicides where the killing is shown by eyewitnesses, is that as to the former class the jury must weigh the circumstances, and determine what degree of murder is proven, while as to the latter the court may instruct the jury as to a single degree, or two degrees, or all the degrees, as, or not, the evidence may be applicable to one or more degrees. If the secret killing were shown to be by poison or torture, or necessarily in the commission of, or attempt to commit, a felony, or by lying in wait, then, also, even in cases of circumstantial evidence, the court may restrict instructions to first degree. If the rule were that every secret homicide presumes murder in the first degree, then the slayer of a man whose body is found pierced by bullets, having in its hand a weapon recently discharged, is placed in the same category as he who has slain unseen a defenseless woman, whose polluted corpse bears evidence of the utmost atrocity. Such a rule is not reconcilable with reason, of which law should be the perfection; and the only escape from it is for the jury, and not the judge, to weigh all the circumstances which may satisfy their minds as to how the secret killing may have been effected, and determine the degree of the slayer's guilt."

It is to be seen that the language quoted is readily susceptible of misinterpretation, and its true meaning can be ascertained only when considered in connection with the question before the court and what was really decided in that case. It was decided merely that, where the facts are only circumstantially shown, and they are susceptible of two or more constructions, it is not within the province of the court to determine which construction shall be put upon them, but it is for the jury to construe the facts to determine the degree of the guilt of the defendant. We do not understand the court to have held in that case that the jury is authorized in any case to put with the facts shown by the evidence other facts which are not shown by the evidence, and which exist only in their own imaginations, and thereby convict a man of an offense of which he is not guilty. There is no reason to say that the prin-

ciple involved is any different in a circumstantial evidence case from a case in which the evidence is direct. The only difference as a practical matter is in the application of the principle. We have recently considered this question in State v. Smith, 26 N. M. 482, 194 Pac. 869, where all the New Mexico cases are collected. In that case the evidence for the prosecution was entirely circumstantial, and tended to show murder in the first degree accomplished by shooting by lying in wait. The evidence for the defendant tended to show killing in self-defense. The court, over the objection of the defendant, submitted second degree murder, and the defendant was convicted in that degree. Mr. Justice Raynolds, speaking for the court, analyzed our statute and pointed out the distinctions between the two degrees of murder. We held under the facts in that case that it was proper to submit murder in the second degree, because the jury had the right to discard the evidence of the State as to lying in wait and deliberation, and likewise to discard the evidence of the defendant as to self-defense, and to find from the evidence the premeditated malice which made the act murder in the second degree.

There seems to be, therefore, nothing in either of the two contentions of the Attorney General above mentioned.

[3] We have, then, a case where a man has been convicted of voluntary manslaughter, and where there is no evidence showing, or from which an inference can be drawn, that there was a sudden quarrel, or that there was heat of pasion. To say that either one was present would be to put into the case facts which are not there, and which the jury would have no right to do. We have just now considered this question in State v. Pruett, 27 N. M. 576, 203 Pac. 840, the opinion wherein is handed down along with this one. In that

case we held that the submission of involuntary manslaughter was erroneous, and that the appellant might complain of such error. We discarded what we deemed to be an unsound doctrine to the effect that a defendant might not complain of such error because it was in his favor, and beneficial to him. We wish to adhere to our holding in that case, and here extend the reasoning and doctrine of that case to this one. In that case we pointed out that to allow the court to say that a defendant might not complain of the submission of a false issue to the jury would be to substitute the court as a trier of fact in place of the jury, and to authorize it to hold the defendant guilty in fact of the higher degree of the crime, notwithstanding the jury had found otherwise. Supplementing that statement, it may be said that such holding deprives the defendant of the benefit of the doctrines of reasonable doubt and presumption of innocence. The present case well illustrates this. The crime here was a dastardly assassination. A man without warning was cruelly beaten to death with an ax. The defense was an alibi. The question was whether the appellant committed the act. If he did, he was guilty of murder either in the first or second degree. A verdict accordingly would be supported by the evidence, and no other verdict would be so supported. Why, then, did the jury convict of manslaughter? The only reasonable answer is that the jury had a reasonable doubt as to whether the defendant actually committed the act, and by way of compromise, and to avoid the terrible consequences of a mistake, they found defendant guilty of manslaughter, a crime of which he was not guilty. He thereby lost his right to the benefit of the doctrines of reasonable doubt and presumption of innocence.

There should be no practical difficulty in the administration of the rule that instructions should be limited to the degree of the crime shown by the evi-

dence. It is within the province of the court to submit to the counsel for the state and for the defendant in every case the question as to what degree should be submitted to the jury. When thus called upon by the court it is their duty to speak, and a refusal by counsel for defendant to take a position upon the matter will amount to a waiver of the error of the court in that regard, if error shall occur. It will be available error only in case the court fails to agree with counsel as to the proper scope of the instructions.

The defendant by the verdict has been acquitted of murder, and has been convicted of a crime of which he is not shown to be guilty, and he is consequently entitled to be discharged.

It follows that the judgment is erroneous, and should be reversed, and the cause remanded, with instructions to set aside the judgment, dismiss the cause, and discharge the appellant; and it is so ordered.

RAYNOLDS, C. J., concurs.

DAVIS, J., did not participate.