76 P.2d 19

### STATE v. MOORE.

#### No. 4303.

Supreme Court of New Mexico.

Jan. 20, 1938.

Tom W. Neal and Margaret Neal, both of Lovington, and C. M. Neal, of Hobbs, for appellant.

Frank H. Patton, Atty. Gen., and Richard E. Manson, Asst. Atty. Gen., for the State.

ZINN, Justice.

The defendant (appellant here), M. E. Moore, was charged with the crime of murder in the first degree. His defense was that at the time of the homicide he was suffering from insanity or a diseased mind. He was found guilty of voluntary manslaughter, sentenced to the penitentiary, from which this appeal is prosecuted.

Evidence was introduced tending to show that Harper, the deceased, had had illicit relations with the defendant's wife; that defendant had found them together in his home. As a result of this the defendant and his wife had separated. Three days prior to the homicide the wife left the defendant with the apparent purpose of going to Eastland, Tex., to secure a divorce. Instead, she met deceased in Eunice, N. M., and went with him to Hobbs, N. M., where they registered at a tourist camp as man and wife and stayed there two nights. The defendant came to Hobbs and while on the street saw his wife with Harper, a fight ensued, four shots were fired, and Harper was shot. Harper died about three days later.

On appeal the defendant assigns as error seven points. Each will be considered as presented.

■ Under the first point the defendant complains of the admission of certain portions of a written statement made by the defendant's wife immediately following the fatal shooting. Witness Wooten, while on the stand, upon cross-examination, was asked if the defendant's wife had made any "remarks" relating to her feeling for the deceased Harper. The witness responded that the wife had made a statement, which *statement* was in the hands of the district attorney. Counsel for the defendant then asked witness Wooten the following: "Q. In that *statement,* did she say anything about her affection for the deceased?" The witness responded: "A. She said she loved him."

Upon redirect examination of witness Wooten, over objection of counsel for defendant, the court permitted the district attorney to read to the jury part of the statement.

The defendant interposed his objection to the introduction of the statement, for the following specific reasons: Because he was not present at the time the statement was made, because it is an attempt indirectly to make the defendant's wife a witness against him, and because the written statement contains many statements of facts about which witness Wooten was not examined upon cross-examination, and also because the statement contains many incompetent and irrelevant statements of fact. The court admitted part of the statement into evidence on the theory that it related to testimony brought out by the defense on cross-examination.

We see no need of encumbering this opinion with a complete narration of what transpired immediately preceding and during the introduction of the statement, nor the statement itself. We have already set forth the question asked by counsel for defendant of witness Wooten and his response. This response clearly showed, irrespective of a later confusion in the mind of Wooten, that the witness believed that in the *written statement* of the wife she stated that she loved the deceased. The statement itself, however, shows that what she said was: "I told my husband about two weeks ago that I loved Johnnie (referring to deceased) and ask him to give me a divorce."

There is a difference between what witness Wooten believed the wife had said as indicated by his answer on cross-examination, and what the statement actually contained.

Counsel for the state and counsel for defendant agree the general rule of law to be that where a party introduces or goes into part of a conversation, statement, or writing, his adversary is entitled to go into the remainder of such conversation, statement, or writing if necessary to explain, limit, or throw light upon the matter already introduced. 4 Wigmore on Evidence, 2d Ed., §§ 2113-2115; 3 Jones Commentaries on Evidence, § 1063. That being

true, it was clearly admissible to show that the wife in her statement had said that *she had told her husband* that she loved the deceased, and not as witness Wooten believed the statement to be that she had therein stated that she loved the deceased.

■ As to the remainder of the statement admitted, we do not deem it necessary to determine whether the same was or was not admissible. Counsel for defendant failed to segregrate the admissible from the inadmissible portion and confine his objection to the latter. His objection went to the statement in its entirety. We have pointed out that part of it that was admissible. The failure to specify the objectionable part, if any, brings this clearly within the rule announced by this court in the case of State v. Hernandez, 36 N. M. 35, 7 P.2d 930.

■ The second claim of error is that the introduction of the statement was tantamount to making the wife of the defendant a witness against him contrary to Comp.St. 1929, § 45-505. We have related the manner and circumstances under which the statement was admitted. Counsel for defendant asked of witness Wooten whether or not the wife of the defendant had said anything in the statement about her affection for the deceased. In so asking, the defendant introduced his wife as a witness to the jury and court. Under the circumstances he cannot complain. Under the rules of evidence the state was authorized to inquire into the statement made by the defendant's wife. Clearly the defendant

cannot complain of his own action in bringing into the record his wife's statement and thereby making her a witness.

■ Furthermore, the defendant waived the question of competency by later calling his wife to the stand as a witness in his own behalf.

We come now to the third assignment of error.

The court instructed the jury on murder in the first degree and murder in the second degree. The jury was also instructed on the law of voluntary manslaughter at the request of counsel for defendant.

The jury was then instructed on the law of insanity as it related to the defense interposed by the defendant.

The court without objection gave the jury this additional instruction: "15. If you find that the defendant shot and killed the deceased because of some grievance against him, resulting from past conduct of the deceased with defendant's wife, and the defendant was not at said time insane as insanity had been defined to you, then the defense of insanity is not available to the defendant and you will not acquit him on that ground."

After the instructions had been given to the jury and counsel for the state and defendant had concluded their argument, the jury retired to deliberate. After the jury had been out approximately eighteen hours, the jury returned into court and the following transpired:

"The Court: Gentlemen of the jury, did you have some request you want to make of the court?

"Foreman: We would like to have the sentence on these degrees.

"The Court: Come up, gentlemen.

"(Attorneys go to the bench.)

"The Court: Gentlemen, have you been able to agree upon a verdict in this case?

"Foreman: On two counts.

"The Court: Gentlemen of the jury, relative to the penalty in the case as to the degrees which have been submitted; that is, first degree, second degree and manslaughter, the supreme court of this State has held that it is improper for the district court to advise the jury as to the penalty but the due province of the jury is to find the guilt or innocence of the defendant. Gentlemen, I am going to give you this additional instruction. Upon your report that you are unable to agree, the court instructs you as follows: 'The Statutes of New Mexico provide that "any person who kills another who is in the act of having carnal knowledge of such person's legal wife, shall be deemed justified; provided such husband and wife are not living separate but together as man and wife." '

" 'In this case, I instruct you that if you find the defendant was sane at the time he shot and killed the deceased, if you find he did, then the fact that the deceased may have theretofore had sexual intercourse with the wife of the defendant would not justify his slaying by the defendant, but it is a circumstance which may be considered by you in connection with all the other facts and circumstances in the case as showing provocation and in mitigation of his crime; that is to say, it might be a circumstance which would cause a condition of such anger on the part of the defendant as to render him incapable of premeditation or deliberation and reduce the killing to manslaughter.'

"You may retire and further consider your verdict.

"Melvin Neal: Comes now the defendant and excepts to the giving of the additional instruction by the court, for the reason that the same is not based upon the evidence in this case, is entirely outside of the purview of the evidence herein, was given after argument and after the jury had been out for eighteen hours, and is highly prejudicial to the defendant.

"Mr. Tom Neal: And for the additional reason that the instruction contains only a statement of abstract law, not in any wise pertaining to this case, or the issues presented by the testimony, and further giving it at this time deprives the defendant of the right to argument of the facts therein presumed to the jury.

"The Court: The record is full of testimony as to the acts of the deceased and the defendant's wife intimacy, and was strongly argued to the jury by counsel for the defendant in connection with the insanity plea. In view of the evidence and the argument it is a proper instruction.

"Mr. Neal: We don't agree with the court.

"The Court: It is taken from the case of State v. Greenlee [33 N.M. 449, 269 P. 331].

"Mr. Neal: We except to the instruction and the ruling of the court thereon.

"(The jury returned into court at 9:40 a. m.)

"The Court: Gentlemen, have you agreed upon a verdict?

"Foreman: Yes, sir.

"The Court: Gentlemen, your foreman has handed up a verdict finding the defendant guilty of voluntary manslaughter and recommending clemency. Is that the verdict of the jury?

"(All answered affirmatively.)

"The Court: The verdict is received and ordered filed."

The defendant contends that the court erred in voluntarily instructing the jury because it deprived the defendant of an opportunity to argue the facts to the jury after instructions. The defendant contends that rule 70-104 of the Supreme Court Rules of Pleading, Practice and Procedure, in courts, other than the Supreme Court of the State of New Mexico, effective May 1, 1935, and which rule reads as follows: "The instructions given, whether as requested or of the court's own motion, shall be in writing and shall be read by the Judge to the jury in all cases before the argument," insures to every defendant a right to argue to the jury after the instructions are given.

It is true that the additional instruction was given to the jury after argument of counsel and without opportunity to counsel for defendant to reargue the case. The defendant, through his attorneys, under rule 70-104 had a right in the regular course of the trial to have the facts of his case argued in light of the instructions under which the jury was to consider the case. This rule must give way, under certain circumstances, to another rule.

It is the rule that the giving of additional instructions to aid the jury in reaching a correct solution has always been a matter in the sound discretion of the trial court. Allis v. United States, 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91; Caldwell v. United States, 10 Cir., 36 F.2d 738; Phares v. State, 158 Ark. 156, 249 S.W. 551; Davis v. People, 83 Colo. 295, 264 P. 658; State v. Searles, 113 Conn. 247, 155 A. 213; People v. Hudson, 258 Ill.App. 378; McClellan v. State, 118 Tex.Cr.R. 473, 40 S.W.2d 87; State v. Frandsen, 176 Wash. 558, 30 P.2d 371.

The charge may be given on the court's own motion and it is not restricted solely to matters requested by the jury. People v. M'Kay, 122 Cal. 628, 55 P. 594; Davis v. People, supra; State v. Chandler, 31 Kan. 201, 1 P. 787; 16 C.J. 1087, § 2553.

The reason for the latter rule is manifest. It is in the province of the trial judge to see that substantial justice is accomplished. He has inherent power to give

the jury legitimate aid to effect that object. We think that the rule is well stated in People v. Perry, 65 Cal. 568, 4 P. 572, 573, where the court said: "Two hours after the jury had retired for deliberation, the court, without any request on the part of the jurors, directed that they be brought in, and proceeded to recharge them. It is not complained that the court erred in its recharge with respect to any matter of law, but it is contended that, by section 1138 of the Penal Code, the court is prohibited from charging a jury after they have retired, unless they shall themselves request the officer to conduct them into court. In the case at bar defendant and his counsel were present when the order was made that the jury should be brought in, and when the additional charge was given, but, so far as appears from the transcript, no objection was made to the order until after the charge was concluded. We think, however, that section 1138 only declares the right of the jurors to demand to be reconducted into court. It is not a limitation upon the power of the court. The court possesses an inherent power to cause the jury to be returned for further instructions, a power wisely employed whenever the judge becomes convinced that he has not made them fully to understand an appropriate proposition of law, or has omitted to state portions of the testimony proper to be stated."

The authority of the court to give additional instructions was recognized by this court in State v. Hunt, 26 N.M. 160, 189 P. 1111, and Territory v. Donahue, 16 N.M. 17, 113 P. 601.

It is manifest that when the jury has requested additional instructions, or if the court, without request, recharged the jury, it would ordinarily be cumbersome to have the jury again placed in the jury box and counsel to again be permitted to argue the case. The court must clearly be permitted latitude to exercise the sound discretion vested in him to aid the jury in reaching a correct solution of the problem or problems of fact presented to the jury for determination.

We adopted rule 70-104 permitting argument of counsel after the instructions had been given the jury rather than before the giving of instructions to the jury as a preferable method of presenting a case. We believed that argument of counsel subsequent to instructions would aid the jury more than argument of counsel preceding instructions. However, this was not intended as an invariable rule which is to be administered in such a manner as to deprive the jury of the right to ask for additional instructions or deprive the trial judge of his right to give additional instructions without being subjected to the possibility of a mistrial unless the court permits reargument. The court did not err.

The fourth assignment is predicated upon a claim that the court erred in permitting the prosecuting attorney to argue questions of law to the jury, which argument the defendant contends was outside of and beyond the instructions of the court. We do not deem it necessary to go into details in this opinion relating to the claim of error. We find no error.

We come now to the fifth assignment of error. The defendant contends that the trial judge erred in refusing to give defendant's requested instruction which in effect is that if the jury believed that even if the defendant did know that it was wrong to kill, yet as the result of some form of insanity the defendant did not have the will and mental power to restrain him from killing Harper, that it was the duty of the jury to acquit.

Without going into an academic, physiological, and psychological discussion as to the difference between the irresistible impulse rule and the "right and wrong test" rule as applicable to criminal guilt, we merely reassert our adherence to the rule enunciated by this court in the case of State v. Roy, 40 N.M. 397, 60 P.2d 646, 650, 110 A.L.R. 1, where we said: "The capacity of the accused to distinguish right from wrong in respect to the act charged as a crime at the time of its commission is made the test of his responsibility."

Just as long as human beings live with other human beings in a state of organized society, irritations will occur to arouse anger, jealously, and hatred. Nevertheless, human reason, which is supposed to place us in a position superior to other animals, makes us realize that we are not to fly from anger to violence without punishment unless we would destroy the compatible association of man with man. At the present time we shall leave to psychiatry the discussion of when an irresistible impulse in certain individuals ought to be excusable in law. We are here to apply the law as applicable to the facts of this case.

We cannot, in the administration of the law, as yet developed, apply a different rule in each individual case. It may be true that different minds react in different ways under given circumstances. However, we must apply a general test gauged by the reaction to the given circumstances of the hypothetical "average man" as such average man is visualized by law and society. To hold otherwise would leave the door open to a defense of irresistible urge or impulse under every imaginable circumstance.

As we said in the case of State v. Nevares, 36 N.M. 41, 7 P.2d 933, where the accused was contending for an instruction of voluntary manslaughter because he was peculiarly susceptible to excitation, anger, or passion, and therefore ought to have a different rule applied to him even though he knew the difference between right and wrong:

"We have heretofore held with respect to the plea of self-defense in homicide cases that the standard by which must be determined the reasonableness of accused's belief in the apparent imminence of danger is that of an ordinary person of firmness, reason, and prudence; and that the question is not to be determined from the standpoint of the accused. State v. Chesher, 22 N.M. 319, 161 P. 1108; State v. Dickens, 23 N.M. 26, 165 P. 850; State v. Parks, 25 N.M. 395, 183 P. 433. We have also held that proof of the impaired mental con-

dition of an accused at the time of a homicide resulting from voluntary intoxication may not be employed to reduce the grade of the offense from murder in the second degree to manslaughter, unless elements of the latter offense are otherwise present. State v. Cooley, 19 N.M. 91, 140 P. 1111, 52 L.R.A.(N.S.) 230; State v. Brigance, 31 N.M. 436, 246 P. 897.

"So in the case at bar, the appellant's peculiar susceptibility to excitation, anger, or passion, even though resulting from a defective mentality, which still left him capable of distinguishing between the right and the wrong of the offense with which he stood charged, cannot aid him. He must have applied to him, for determining the adequacy of provocation relied upon, the test of its effect on the ordinary man of average disposition. Measured by this test, the correctness of the trial court's refusal to submit voluntary manslaughter is readily apparent. The appellant importuned deceased, his former sweetheart, to go driving with him. She refused and informed him she was through with him. He went away, evidently brooded, and, returning a few minutes later, slew her. It was murder, and the court properly declined to submit voluntary manslaughter. State v. Trujillo, 27 N.M. 594, 203 P. 846; State v. Luttrell, 28 N.M. 393, 212 P. 739; People v. Ortiz, 320 Ill. 205, 150 N.E. 708; Braunie v. State, 105 Neb. 355, 180 N.W. 567, 12 A.L.R. 658; Commonwealth v. Russogulo, 263 Pa. 93, 106 A. 180; State v. Kotovsky, 74 Mo. 247; Fry v. State, 81 Ga. 645, 8 S.E. 308; Hill v. State, 74 Tex.Cr.R. 481, 168 S.W.

864." State v. Nevares, 36 N.M. 41, 7 P.2d 933, 936.

■ And so here. The defendant saw the deceased with defendant's wife. He became angered. From anger he flew to violence. Under the circumstances we have held that the jury could believe that the killing was done in the heat of passion. State v. Greenlee, 33 N.M. 449, 269 P. 331, 334. Heat of passion it might be, but heat of passion is not insanity in law.

■ The defendant in his sixth assignment of error claims that the court erred in giving the jury on his own motion, and after the jury had been out for a considerable time, the instruction set forth in our review of the third assignment of error. Counsel for defendant attempts to take the first part of the instruction, which relates to the law of justifiable homicide when committed upon one who is in the act of having carnal knowledge of the accused's legal wife, and thereby show that an issue entirely foreign to the facts in the case had been injected by the court for the consideration of the jury.

The part complained of, taken with the rest of the instruction of which it is a part, is clearly a proper instruction and understandable. The court had already given instruction No. 15 as set forth in our disposition of point 3. The defendant was contending that the intimacy of Harper with defendant's wife was the cause of his temporary insanity. The theory of the prosecution was that the defendant was not insane. The court clearly had the right

to explain to the jury as to when a homicide would be justifiable and when it would be reduced to manslaughter because of a belief by the defendant that the deceased may have theretofore had sexual intercourse with the defendant's wife, and which belief caused a condition of such anger on the part of the defendant as to render him incapable of premeditation or deliberation. The defendant requested the court to instruct on voluntary manslaughter. The additional instruction given by the court on his own motion was proper in light of the evidence and the defendant's consent to the instruction on voluntary manslaughter.

This point clearly comes within the rule announced in the case of State v. Greenlee, supra. In that case the facts were somewhat similar to those in the case at bar. There was evidence of intimacy but insufficient to constitute a defense of justifiable homicide under Comp.St.1929, § 35-315. In that case the defendant contended that the court committed error in submitting voluntary manslaughter. In passing upon the proposition we said: "It is contended that the court erred in submitting manslaughter. It is pointed out that 'there is no contention in Greenlee's testimony that he killed Shepherd under the influence of any anger or passion.' It is urged that there could be no middle ground between a deliberate slaying for revenge, as contended by the state, and a justifiable homicide, as contended by appellant. It is true that, where there is no evidence that the homicide was committed in heat of passion, manslaughter should not be submitted.

State v. Trujillo, 27 N.M. 594, 203 P. 846; State v. Hunt, 30 N.M. 273, 231 P. 703. It is not to be questioned that the circumstances surrounding this homicide were sufficient to warrant a conclusion by the jury that appellant acted in heat of passion. That is true, although it was not a fact, or appellant's reasonable belief, that adultery had been, or was about to be, committed. The jury might, upon the facts in evidence, find, contrary to the contentions both of the state and of the appellant, that the slaying was done in heat of passion. State v. Smith, 26 N.M. 482, 194 P. 869, approved in State v. Trujillo, supra."

The instruction complained of was couched in careful language to the effect that it should only be considered by the jury in determining the elements of manslaughter; that is, did the defendant, under the circumstances, act in the heat of passion? In view of the evidence adduced in the case, it was undoubtedly correct and proper.

■ The seventh and final assignment of error of the defendant is his contention that the evidence conclusively shows he was insane at the time he fired the shots which killed Harper; that having overcome the presumption of sanity, it then became the duty of the state to prove beyond a reasonable doubt that the defendant was sane. The defendant contends that the state failed to do so and that he was therefore entitled to a directed verdict of not guilty. We disagree with the defendant in this claim of error.

Able counsel for the defendant contend that a perusal of all the testimony of all

the witnesses shows conclusively that the defendant was insane at the time he fired the fatal shots. This assertion of counsel for the defendant is based on testimony of three doctors. Two of them testified as witnesses for the defendant and one for the state.

The following hypothetical question was propounded to both Dr. H. W. Gillett and Dr. Allen P. Terrill, called as witnesses by the defendant, neither of whom qualified as alienists or psychiatrists, but did qualify as physicians in the general practice of medicine:

"Q. Doctor, assuming that a young man 27 years old, of white parentage, was born when his mother was about 25 years of age, his maternal grandmother since the earliest recollection of his mother, had been subject to mental delusions and hallucinations, imagining her friends and neighbors had done her wrong, and believing at other times that she had wronged her neighbors and friends, when in fact such delusions and hallucinations were wholly without foundation, that such condition existed from the time the maternal grandmother was 40 or 45 years of age, until she died in 1918, at the age of 73; that it further appears that a blood cousin of the young man's mother, at the age of about 55, was committed to the asylum, and is now out on parole, and when committed was suffering with the hallucination that his wife was untrue to him, when in fact no foundation existed therefor; that it further appears that the father of the young man, at the age of about 37, lived in Frost, Texas with his wife and four minor children, appearing to be devoted to his family; that about the said age of 37 years, the young man's father left home to accept a position in Eastland, Texas, a neighboring town, and so far as known the father never appeared at Eastland, Texas, to accept the position, and in fact was not heard from nor found by his family for a period of sixteen years, when he was discovered by relatives in a public hospital at Los Angeles, California, suffering from paralysis, and was unable and is now unable to talk coherently, and nothing is known of his history during his 16 years of absence, and he is now at Frost, Texas, in a paralyzed condition;

"That this young man grew up in the town of Frost, Texas, was from childhood of a nervous temperament, and as he grew older would sit for hours without speaking unless spoken to, and had the delusion that his mother thought more of the other children than of him; when disappointed in any desire he was subject to fits of melancholy; the young man as a boy stood well in his classes at school, stood well in his classes, until he had completed the tenth grade at the age of 16 or 17 years, he then quit and went to work in supporting his mother and a younger brother and a sister; he was quite sober and steady in his habits and of a peaceful and not quarrelsome disposition; during his young manhood he seemed to care little for the association of girls and women of his own age, but in about 1931, met a young lady to whom he became devoted and married her in 1933;

during his married life he was subject to periods of melancholy for a day or longer after a family spat, and when out of work was melancholy; that since in March in 1933, he had worked in the oil field as an oil-field worker with- his wife's father, and in January, 1936, went to Monument, in Lea County, New Mexico, with his wife, where they opened up a restaurant and working in the restaurant and aiding his wife in the management thereof while waiting for work in the oil field. Shortly after the restaurant was opened, a man by the name of J. V. Harper, a welder in the oil field, began to take his meals at the restaurant, and immediately became especially friendly with the wife, visiting their home only in the absence of the husband, and about this time Harper began making love to her, hugging and kissing her, and fondled her; the young man having obtained a position with the Imperial Boiler Works as helper and being frequently called away at night to work, at such times Harper would go to the home with the wife and remain in the home hours at a time, making love to her and trying to persuade her to leave the young man and live with him. The young man was advised by a fellow employee that Harper was trying to get Moore transferred to another truck, so Harper would have more time to visit with Mrs. Moore. About the 18th or 19th of May, when the young man came home one night, he found his wife and Harper sitting on the side of the bed in the bed room, and thereupon told Harper to leave and stay away from his house,

and leave his wife alone, and that in talking to his wife about the matter, he was told by her that Harper, for some months had been making love to her, coming to her home in the husband's absence, and that she liked him better than she liked the young man, but that Harper wanted her to leave- her husband, get a divorce, and marry him. The young man thereupon became blue, crying, begging his wife not to leave him and go away with Harper. She finally agreed to get Harper out of her life and continue to live with her husband.

"The next night, however, after this, the young man saw Harper and his wife together about 9:30 at night, and approached them, and told his wife in Harper's presence, that Harper was the best man, he could have her, but that she was a decent woman and that Harper must treat her as such and let her go to her father, which she agreed to do. The young man then left his wife and Harper and didn't go home that night at all.

"The next night after this, his wife drove Harper's car to the Moore home and went into the house. The young man went to the house and went in, and was told by his wife that she was going with Harper, but would go home with her father. He thereupon told her that she could not leave with Harper, that she must not go off with him, that if she was going home, she could go home to her father, but she could not go with Harper. A neighbor woman took the wife down towards Eunice in her car. The young man, the day before quit his job and

didn't go for his wages. After his wife left, he was morose, and appeared to be in a study about something, and very worried, and wouldn't talk to his friends until spoken to several times, often walking off when accosted, and would have nothing to do with them. He slept little, if any, at all one night immediately prior to the incident, for several days having a blank look out of his eyes. On the 23rd day of May, A. D. 1936, about 9 o'clock or 10 o'clock at night, he saw his wife and Harper walking along the streets of Hobbs, approached them, grabbed Harper by the arm, shooting him four times. He was arrested by the officers, appeared in a nervous, excited condition, having a dazed and unnatural look in his face, was asked why he shot Harper, and said, 'I shot him. I intended to kill him. He treated me worse than any man ever treated me. That woman is my wife.' Then shortly after his arrest, he appeared sleepy, and could hardly stay awake while officers were talking to him, appearing wholly exhausted.

"Now, doctor, assuming what I have read here to be the facts, in your opinion, would you say that this young man was sane or insane at the time he fired the shots?"

Dr. Gillett, in answer to the foregoing hypothetical question and other questions propounded to him on direct and cross examination, answered practically as follows:

"A. I would say that the man was undoubtedly insane. * * * I would say that he undoubtedly did not know right from wrong. * * *

"A. The young man was not in a mental condition and sufficiently balanced to have understood the seriousness and consequence of his acts. * * *

"A. In view of the fact that this defendant has some apparent motive and plenty of opportunities and had sufficient self-control not to shoot this man I would say that at the time he shot him he undoubtedly was insane."

"Q. What do you base your opinion on when you say this man was undoubtedly insane, doctor? A. On several considerations. The man has a definite background of heredity which would render him susceptible to attacks of insanity. The next one—the second point, I would say, is that the man had gone through a very harrowing experience in the previous few days which was of sufficient intensity to unbalance him. And the third point is that the man's own personal history shows a tendency to instability mentally. * * *

"A. The case history of the defendant's grandmother is an important point in the background. That alone of course would not have the same weight that this case has where there are several blood relatives who can be considered insane. * * * I refer to the defendant's maternal grandmother, the cousin and Mr. Moore's father.

"A. I believe he was suffering from a functional mental derangement.

"Q. Are the changes you refer to those that are caused by his emotional anger at this man who was with his wife? A.

They may have been precipitated by the mental state that he was in."

Dr. Terrill testified on the basis of the hypothetical question that he believed the defendant was insane, and was not sufficiently mentally well-balanced to know and determine the right from wrong, and that the defendant did not understand the seriousness of his act and the consequence thereof. On cross-examination by the district attorney, Dr. Terrill said: "A. An explanation of the workings of the insane mind has been so far beyond the greatest alienists that they cannot explain it and I cannot explain it. They know what they are doing in many instances but they do not know and do not appreciate why they are doing it or the consequences of their acts."

The witness said:

"* * * the hypothetical question produces the two things, the two great causes of insanity, heredity and strain, and if you produce those two causes they are the major causes of insanity and with those two causes you have a dementia praecox and a paranoia, * * *

"Q. How long do these things usually last? A. They last always, given the same conditions or conditions similar.

"Q. Does a man with one of those conditions know the difference between right and wrong, ordinarily? A. Ordinarily, no. I think there are times when they are, have lucid intervals, as nearly all insane persons do. There are times when they have lucid intervals, but given the same mental strain again they might go off on the same tangent, or a different tangent, at another time.

"Q. As applied to this case do you mean this man is suffering from dementia praecox with a paranoid tendency? A. Very likely so.

"Q. Under like conditions, he might kill another man? A. Under like conditions a continued mental strain, yes, sir, he might.

"Q. You think he is insane now, do you? A. I do. If he was insane at that time then he is insane now.

"Q. Do you think he knows the difference between right and wrong? A. He might or might not. If he is in a lucid interval he might or he might not.

"Q. In your opinion then he is suffering from a mental disease? A. Yes, sir.

"Q. What is that? A. Dementia praecox with paranoid tendency.

"Q. What sort of a disease is that? A. I can't tell you. None of the authorities attempt to tell what it is. It is a brain disease."

In addition to the testimony narrated above, Dr. Terrill, who gave the appearance of knowing much about the subject of insanity, testified on cross-examination as follows:

"Q. But from this hypothetical question of facts, what is there about it that makes you think that this man has dementia praecox with paranoid tendencies? A.

Because his maternal grandmother had· it; because he had an uncle on his mother's side, a cousin on his mother's side who had been sufficiently insane to be confined at one time in a hospital and because the father—(interruption). The blood cousin of the young man's mother was insane, that the father was a paralytic and from his paralysis was in such condition that even at this time he cannot make coherent statements. The maternal grandmother suffered from hallucinations and delusions of abuse, and the fact that she believed that she probably had ·abused and wronged somebody else are ·paranoid tendencies and are the tendencies which are most frequently hereditary. Those facts· would lead you to believe you were dealing with a paranoiac. * * *

"Q. And appreciated the fact he was likely to kill a person whom he shot? A. That is very true.

"Q. And the fact that he was able, in his own mind, to reason that he had been wronged by this man who had gone off with his wife doesn't lead you to believe he knew the difference·between right and wrong? A. No; because of the fact that under the same state of circumstances, under even more violent circumstances according to the hypothetical question, he had refrained from killing the man and until the strain became sufficiently severe; that is the reason at the time, he didn't do it.

"Q. The fact that he didn't shoot this man earlier in the game is one thing?

A. One of the things, yes, sir. That is one of the things that would lead you, ·if he caught the man in his house in his wife's bedroom on the bed with his wife, and didn't murder didn't kill him at that time, and continued to tell the man to leave his wife alone, held off until the strain became sufficiently severe to wreck his mind which was already in a weakened condition from heredity, is prima facie evidence that he did not commit this act until his mind had left him, to a certain extent.

"Q. Is it possible that he could have been suffering from anger? A. Certainly he was suffering from anger and had been, very probably, suffering from anger for days and weeks. That is their trouble.

"Q. Is it possible that under these conditions a man might become so angry he would kill another man? A. He might, yes. Men have done it but other men have not. It is a question of two principal causes, heredity and strain. If the strain becomes sufficiently severe the mind goes to pieces and until it does the mind functions practically normally.

"Q. Then is it your belief in this case, this man became so angry when he suddenly saw those people there that he shot this man? A. No, I don't think he became so angry he shot him, simply his mind, he became insane."

Dr. C. F. Stone, a witness called in behalf of the state, testified on direct and cross examination as follows:

"By District Attorney Reese:

"Q. Doctor, I wish you would tell the jury your qualifications as a doctor, where you went to school? A. Why, four years in medical school at Dallas, Baylor, one summer in Denver, Colorado, two years interneship, and six years practice.

"Q. During your study and practice, have you had occasion to come in contact with mental cases? A. Well, we had the usual run of mental cases in the hospital, and the usual run of general practice.

"Q. Did you hear the hypothetical question which was read by Judge Neal to the witness Dr. Gillette? A. Yes, sir.

"Q. Assuming that the facts there stated are true, doctor, in your opinion, at the time this shooting took place, did this defendant know and understand the nature and consequences of the act which he did? A. I think he understood what he was doing.

"Mr. Neal: We object to the answer as not responsive to the question, and the question is not proper,

"The Court: Objection overruled. You may follow it up with another question.

"Mr. Neal: Exception.

"Q. Doctor, in your opinion, under that state of facts, do you think that the hypothetical man knew the difference between right and wrong? A. Probably at all times except momentarily.

"Q. What do you mean by that? A. Well, I think that probably he understood the acts and the consequences except at the critical, momentary time of the act.

"Q. What was his condition then, in your opinion? A. Well, I think probably due to the excitement and the anger, was the cause of his loss of reasoning power momentarily.

"Q. From the statements as to the man's actions and statements immediately following the shooting, is there anything to indicate to your mind that the man was sane or insane? A. I think his actions were sane after the time of the accident.

"Cross-Examination

"By Mr. Neal:

"Q. I understood you to say, doctor, in your opinion, at the moment the shot was fired and the act was done, the man did not, in your opinion, know right from wrong? A. Momentarily.

"Q. Yes, that is all.

"Redirect Examination

"By Mr. Reese:

"Q. Do you mean in your opinion—

"Mr. Neal: (Interrupting) We object to the prosecuting attorney cross-examining his own witness.

"The Court: Overruled. He has not asked the question.

"Q. In your opinion, at that time the man—

"Mr. Neal: Exception:

"Q. (Continuing) Didn't know it was wrong to shoot another man? A. I don't think he had time to consider it at that time.

"Q. Do you, doctor, trying to get the matter a little clearer to you—assume that the law of insanity, applied to a case of this kind, is that before a man is to be excused from his actions on the ground of insanity, he must be in such a mental condition, suffering from mental disease, that he either doesn't know and understand the nature of the act and the consequences of the act which he does, or that he is unable to distinguish between right and wrong. Now, do you consider from this hypothetical statement that this man was insane?

"Mr. Neal: We object to the question because it includes only mental disease and does not include mental weakness or derangement other than disease and it is improper redirect examination.

"The Court: Overruled. If there is anything further which you desire to ask him, you may ask him.

"Mr. Neal: Exception.

"A. I think he was insane momentarily.

"Q. Do you consider that everyone who kills another, doctor, under conditions like that is insane temporarily?

"Mr. Neal: Object to that as cross-examining his own witness.

"The Court: Overruled.

"Mr. Neal: Exception for the reasons stated.

"A leading question also.

"The Court: Overruled.

"A. I think that anyone is temporarily insane when they act under a hypothetical question like this."

However, from the facts before the jury, and which are fairly summarized in the hypothetical question, the jury could rightly disagree with the experts and bring in a verdict of guilty, and we believe that there is substantial evidence to support the jury's verdict.

▄▄▄▄ The law on the subject in issue has already been enunciated in this jurisdiction. See Faulkner v. Territory, 6 N.M. 464, 30 P. 905; Territory v. McNabb, 16 N. M. 625, 120 P. 907. We said in the case of State v. Roy, 40 N.M. 397, 60 P.2d 646, 650, 110 A.L.R. 1, as follows: "When the defendant has put in evidence reasonably tending to show him insane, the problem is then to determine whether it is sufficient to take the case to the jury. This is a question for the court to determine. Therefore, when all the evidence is in, if there has been adduced competent evidence reasonably tending to support the fact of insanity urged by the defendant as a defensive issue in the case, it is the duty of the court to instruct on the question of insanity." It is clear that in this jurisdiction the presumption, that one accused of crime was sane at the time the alleged crime was committed, serves merely the function of casting upon the defendant the necessity of going forward with evidence tending to show that he was insane at the time the alleged crime was committed. If the state has of-

fered evidence which tends to show that the defendant was insane at that time, the defendant is even relieved of that burden. Until evidence is offered and received at the trial which tends to show that the defendant was insane at the time of the alleged crime, the state may rely upon the presumption of sanity and need not offer evidence to establish that fact. In the absence of evidence, sanity is assumed to exist without evidence of its existence. When, however, evidence is received which tends to show that the accused was insane at the time of the alleged offense, then, and in such case, an issue is raised as to the mental condition of the accused, and it becomes *the duty of the jury* to determine such issue from the evidence independent of the presumption of sanity. If the jury, however, disbelieves the evidence, then the presumption stands. The court fully understood the law and instructed the jury accordingly.

The evidence relating to the defendant's conduct at the time he was informed of his wife's proposed separation and divorce, and of his actions subsequent to the time his wife left him, and up to the time he took the life of Harper, is as compatible with such sanity as will make the accused accountable for the commission of a crime as with exculpable insanity.

█ The evidence offered to prove hereditary insanity clearly was insufficient. The jury was not compelled as a matter of law to believe that because a maternal grandmother had hallucinations of being wronged or of wronging others, or because a male cousin of the defendant's mother had been confined for a short time in an insane asylum, or because the defendant's father was afflicted with certain physical infirmities, that therefore the defendant was insane.

█ There is nothing in the record to show the nature of the distant cousin's insanity or if the same was transmissible. The record is silent as to the nature and cause of the grandmother's beliefs or delusions. The record shows that the father was physically afflicted and acted peculiarly. However, neither his physical affliction nor peculiar actions are conclusive of mental disarrangement. Even assuming that the evidence offered by the defendant proved the insanity of some of his relatives, and that such affliction was transmissible, we believe the better rule to be that transmissible insanity, of itself, is not independent proof of the insanity of the prisoner, but it is a circumstance which may be used to corroborate other more direct proof of insanity in the accused. Of itself it cannot be used to prove the insanity of the defendant. If there be evidence that the defendant inherited the transmissible insanity, the chain would then be complete. See Commonwealth v. Dale, 264 Pa. 362, 107 A. 743, 6 A.L.R. 1483.

Clearly the evidence does not conclusively show the insanity of the defendant so that we could say that the presumption of sanity was completely destroyed, that there is no substantial evidence to support the

jury's verdict of sanity, and that the court ought to have so instructed the jury.

An appraisal of the medical testimony does not change our view. Dr. Terrill gave it as his opinion that the defendant was suffering from "dementia praecox with a paranoid tendency." The case is barren of facts which tend to show how this "dementia praecox with a paranoid tendency" was acquired by the defendant. The learned doctor did not show under what circumstances such an affliction in the grandmother or distant cousin would render it transmissible so as to taint the blood of the defendant, or even whether the grandmother and distant cousin were likewise afflicted.

■■■ When Dr. Terrill was asked the following questions, and gave the following answers:

"Q. In your opinion then he is suffering from a mental disease? A. Yes, sir.

"Q. What is that? A. Dementia praecox with paranoid tendency.

"Q. What sort of a disease is that? A. I can't tell you. None of the authorities attempt to tell what it is. It is a brain disease,"

he left the court and jury helpless. The court certainly could not take judicial notice of a form of insanity denominated "dementia praecox with paranoid tendency" when the learned doctor could tell nothing about it, coupled with his assertion that none of the medical authorities attempt to tell what it is, even though the

court was aided by such learned works upon the subject as the following: Law of Insanity, Smoot (see chapter where the various forms of insanity are described); Wharton & Stille's Medical Jurisprudence, vol. 1, relating to Mental Unsoundness, wherein we find an excellent treatise covering not only the classification of various forms of insanity, but also the medical aspects and medico-legal aspects of the various forms of insanity. See, also, 32 C.J. beginning at page 599.

As the evidence merely shows that the distant cousin was in an insane asylum, the maternal grandmother had some kind of delusions, the father a paralytic, and the defendant afflicted with "dementia praecox with paranoid tendency," a disease, the nature of which was unknown to the medical profession, it was not conclusive proof of insanity. The court, of course, could not take judicial notice of a fact on which the medical evidence did not show the medical profession to be in unanimous accord. It may have been possible that the court and jury, on the strength of the doctor's positive assertion that he could not tell what sort of a disease "dementia praecox with paranoid tendency" was, other than that it is a brain disease, coupled with the positive assertion that "none of the authorities attempt to tell what it is," rejected his proffered aid as an expert, either based on knowledge that every work on mental diseases has a treatise on dementia praecox and paranoia, or because the doctor's inability to explain the nature of the disease which he claimed the

defendant had did not justify giving credence to his diagnosis. Surely an expert ought not to classify and label an ailment without knowing what it is.

Against the opinion of the doctors, we have testimony showing that the defendant knew what he was doing and why he was doing it. He went armed to Hobbs, followed his wife and deceased down the street, turned him around and shot him. He gave a perfectly coherent and logical reason to the officers as to why he did the shooting. We quote from the testimony of the witness John Wooten at pages 43 and 44 of the transcript:

"A. I said, what is the matter, boy? He said, 'I tried to kill this man, wanted to kill him.' I said 'What did you want to kill him for?' He said, 'Well he done me worse than any man ever done me.'

"Q. Is that all he said? A. That is practically all he said.

"Q. To refresh your recollection, was there anything said there immediately following the statement which you have related, about his wife? A. Yes, sir; there was.

"(A) Q. I said, 'What did you want to kill him for?' He said, 'Well, that is my wife he is with.'"

It also appears that after the defendant was removed from the city jail to the county jail at Lovington, he was cool and calm. Those were not the actions of a crazy man. To the contrary, they reflected a calmness of purpose and extraordinary presence of mind. As to the testimony of Dr. Stone the jury could interpret the same contrary to that contended for by appellant. The import of his testimony was not necessarily that the defendant was insane as understood in the eyes of the law at the time he fired the shot.

It appears that Dr. Stone, in answer to the question of the district attorney as to whether or not the defendant knew the nature and consequences of what he did, said that he thought the defendant understood what he was doing. In answer to the question as to whether he knew the difference between right and wrong, he said the defendant knew this difference at all times except momentarily. At this point we again quote from the transcript:

"Q. What do you mean by that? A. Well, I think that probably he understood the acts and the consequences except at the critical, momentary time of the act.

"Q. What was his condition then, in your opinion? A. Well, I think probably due to the excitement and the anger, was the cause of his loss of reasoning power momentarily."

The answer of the doctor indicates that any aberration of the mind or loss of reasoning power was not necessarily due to any mental disease but rather to excitement and anger.

It is true that Dr. Stone stated that he believed the defendant was insane at the moment he committed the act, but it is readily seen that if the momentary afflic-

tion of the defendant be by some deemed "insanity" it is not recognized in law as exculpatory insanity.

 Insanity, to excuse crime, must be such as dethrones reason and renders the subject incapable of discerning right from wrong, or of understanding or appreciating the extent, nature, consequences, or effect of his wrongful act. State v. Roy, supra. A mere uncontrollable impulse of the mind, coexisting with possession of his reasoning powers, will not warrant an acquittal on the ground of insanity; the question for the jury being whether the defendant, at the time he committed the act, was incapable of knowing the nature and quality of his act, or, if he does know it, that he does not know it is wrong to commit it. State v. Roy, supra. Where the defendant has sufficient mental capacity to distinguish between right and wrong, mere passion or frenzy produced by anger, jealousy, or other passions will not excuse. There may, indeed, be insane impulses which are so far uncontrollable that there is no criminal liability therefor, but they must be shown to be the result of a diseased mind.

As was said: "Thus it is obvious that a paroxysm of jealousy, or sudden anger or frenzy of temper, provoked or superinduced by the intelligence that the accused had been abandoned by his mistress, the object of his lustful affections—he being otherwise in possession of his mental faculties, unimpaired by disease or unbalanced by heredity—will not relieve him of criminal responsibility." State v. Lauth, 46 Or. 342, 80 P. 660, 661, 114 Am.St.Rep. 873.

 The fact that the defendant's reason was temporarily dethroned, by anger, jealousy, or any other passion, or the fact that he has become suddenly depraved to such an extent that his conscience ceases to control or influence his actions, furnishes no defense to a criminal charge. In other words, what is commonly known as emotional or moral insanity is not a defense under the law of this state.

The jury had a right to believe the defendant when he told the officers of the law immediately after the killing that he killed because he had been wronged by the deceased.

"He done me worse than any man ever done me. * * *

"That is my wife he is with."

Here, these words, spoken by the tongue of an outraged husband, fully explain that the defendant not only knew what he had done, but also why he had done it.

In this outburst of relieved passion, and in the evidence introduced showing the circumstances preceding the separation of the defendant and his wife, the jury had a right to believe that the accused became worked up to a high state of passion or frenzy upon discovering that the wife with whom he had been living, and whom he apparently loved, was, as he believed, unfaithful; that she had been dishonored by Harper; that to avenge this wrong he ought to kill Harper, and did so in a revengeful mood.

To upset the verdict of the jury under the facts in this case would be to hold that a person who commits a criminal act should be held irresponsible on the ground that it was done under such an impulse of resentment, jealousy, and revenge as temporarily to dethrone the reason. Heat of passion or feeling produced by motives of anger, hatred, or revenge, is not insanity. A person who acts criminally under such impulses is responsible for his crimes. Some medical experts would denominate such emotion as "insanity," but it is not exculpable insanity.

Clearly this is true under the "right and wrong test" of exculpating insanity in criminal cases which is the law in New Mexico. See State v. Roy, supra. We believe this to be true even in those jurisdictions where the "irresistible impulse" rule has been recognized.

We find: "1. Irresistible impulse of violent passion destroying free agency.— 'An irresistible impulse,' as recognized by some courts as a defense to a charge of crime, and as popularly understood, has been well defined to be an impulse produced by and growing out of some mental disease affecting the volition, as distinguished from the perceptive powers, so that the person afflicted, while able to understand the nature and consequence of the act charged against him, and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it. This class of mental infirmity or 'insanity' is to be distinguished from emotional or moral insanity,' insane delusion, morbid impulse, passion, or overwhelming emotion not growing out of or connected with a disease of the mind. Thus a paroxysm of jealousy or sudden anger or frenzy of temper provoked or superinduced by the intelligence that the accused had been abandoned by his mistress, the object of his lustful affections,—he being otherwise in possession of his mental faculties, unimpaired by disease, and not unbalanced by heredity,—will not relieve from criminal responsibility." Wharton's Criminal Law, 12th Ed., vol. 1, § 408, p. 602.

Summing up our views upon point 7 of the defendant's assignment of errors, we hold that the jury had a right to reject the claim of hereditary insanity because the evidence offered to prove the same was clearly vague and uncertain; the same might be charitably said as to the claim of a diseased mind.

"If the only evidence tending to prove insanity is such that it is disbelieved and disregarded by the jury, then the presumption of sanity remains and should have the same effect as if no evidence had been introduced tending to prove insanity. The jury might well be instructed that in weighing the evidence they may not consider the presumption, yet, if uninfluenced by the presumption they reach the conclusion that the evidence tending to show defendant's insanity is not entitled to

credit and is disregarded by them, the presumption of sanity may then be regarded as remaining in force. See article on 'Presumptions' by Professor Edmund M. Morgan, 44 Harvard Law Review, 906." State v. Green, 78 Utah 580, 6 P.2d 177; see page 187, Folland, J., concurring.

■ The sanity of the accused must be proven by the state just like any other material fact. The determination of that fact from the evidence is left to the jury. It is for the jury to reach a conclusion as to the sanity or insanity of the accused. The province of the experts is to aid the jury in reaching a conclusion. Their opinions are not to be taken as conclusive. The judgments of experts or the inferences of skilled witnesses, even when unanimous and uncontroverted, are not necessarily conclusive on the jury, but may be disregarded by it. 22 C.J. 728. The testimony of an expert is purely his opinion and is not testimony as to facts and is not conclusive, even when uncontradicted. Jamison v. Shelton, 35 N.M. 34, 289 P. 593.

■ In a case where insanity is pleaded as a defense, it is proper for a jury to consider the facts proved for the purpose of testing the value of the opinions, and also their bearing upon the question as to how far they tended to establish the fact of insanity independent of the opinions. See State v. Jones, 64 Iowa 349, 17 N.W. 911, 20 N.W. 470.

Added to the presumption of sanity, after rejecting the evidence that the defendant killed Harper as the result of jealousy, anger, or the belief of an outraged husband that he ought to have revenge.

■ "§ 300(255). Defense of Insanity —Questions of law and of fact—Instructions.—The question of insanity, mental condition or mental disease as a defense to crime, its existence, character and extent is a question of fact in a criminal case for the jury to determine from the evidence * * *. The form of mental irresponsibility or insanity offered to be proved as a legal defense is a question of law." Underhill Criminal Evidence, 4th Ed., p. 591.

■ The jury found the defendant guilty. This was tantamount to a determination from all of the facts that the defendant at the time of the commission of the act was sane. We cannot supplant the conclusions of experts, though unanimous, which unanimity is rare, for the conclusion of the jury's verdict. The jury can reject all the testimony, and we must respect their action unless clearly erroneous. Finding no error, the judgment will be affirmed.

It is so ordered.

HUDSPETH, C. J., and SADLER, BICKLEY, and BRICE, JJ., concur.