PETRA JIMENEZ MAES, Justice (concurring in part and dissenting in part). {55} I concur in the majority opinion that the evidence in the present case is insufficient to establish that the filthy living conditions in Defendant’s home posed a substantial and foreseeable risk of harm to his three children. I disagree, however, that the evidence was insufficient to permit the jury reasonably to find that Defendant recklessly endangered the life or health of five-month old Shelby by placing her to sleep face-down in a small confined space filled with soft bedding. Accordingly, I respectfully dissent from that portion of the majority opinion. {56} The deferential standard by which this Court reviews sufficiency of the evidence claims is well established. [T]he reviewing court engages in a two-step process: First it reviews the evidence [resolving all conflicts and indulging all permissible inferences] with deference to the findings of the [trier of fact]; then it determines whether the evidence, viewed in this manner, could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt. State v. Myers, 2009-NMSC-016, ¶ 13, 146 N.M. 128, 207 P.3d 1105 (second alteration in original) (citation omitted). “Our role is not to weigh the evidence, nor do we substitute [our] judgment for that of the fact finder so long as there is sufficient evidence to support the verdict.” State v. Day, 2008-NMSC-007, ¶ 15, 143 N.M. 359, 176 P.3d 1091 (internal quotation marks and citation omitted). {57} To find Defendant guilty of negligent child abuse contrary to NMSA 1978, Section 30 — 6—1(D)(1) (2005), the jury was required to find the following essential elements beyond a reasonable doubt: (1) Defendant caused the child to be placed in a situation that endangered the child’s life or health; (2) Defendant knew or should have known that Defendant’s conduct created a substantial and foreseeable risk, Defendant disregarded that risk, and Defendant was wholly indifferent to the consequences of the conduct and to the welfare and safety of the child; (3) the child was under the age of eighteen; and (4) this happened in New Mexico on or between September 7, 2003 through October 2, 2003. See UJI 14-604 NMRA. The question is not whether this Court is convinced of Defendant’s guilt beyond a reasonable doubt, but rather, “whether, viewing all of the evidence in a light most favorable to upholding the jury’s verdict, there is substantial evidence in the record to support any rational trier of fact being so convinced.” State v. Graham, 2005-NMSC-004, ¶ 7, 137 N.M. 197, 109 P.3d 285. {58} The evidence established that Shelby’s bassinette had broken approximately a day or two before her death. Defendant planned to retrieve a crib from his mother, who lived in Carrizozo, but in the meantime, he fashioned a make-shift bassinette out of a dresser drawer. Shelby, at five months old, was approximately twenty-six inches in length, and the drawer was only marginally bigger, measuring 29-by-15 inches. Defendant padded the drawer with a sheet, a blanket, and a pillow. {59} On the night of October 1, 2003, Jennifer Wheeler was home alone with Leo, Juan and Shelby, while Defendant went to Alamogordo and Carrizozo. Wheeler and the children fell asleep watching television in the living room. At some point Wheeler woke up, changed Shelby’s diaper, and placed her to sleep in the drawer. Sometime between 3:00 a.m. and 5:00 a.m. the next morning, Defendant arrived home. Shelby woke up, and although Wheeler tried to give her a bottle, she refused to eat. Wheeler and Defendant put Shelby back to sleep in the drawer on her stomach because “she liked to go to sleep on her stomach.” Defendant typically would “neatly tuek[ ]” the blankets around and underneath Shelby, sometimes covering her head, to ensure that the blankets remained in place throughout the night. {60} A few hours later, Wheeler was shaken awake by Defendant. Defendant was holding Shelby, who was covered from head-to-toe in a blanket, and said, “Shelby’s not breathing. She’s not breathing.” Subsequent resuscitation efforts were unsuccessful and Shelby was pronounced dead later that morning. {61} The Office of the Medical Investigator launched an investigation into the cause and manner of Shelby’s death. Cheryl Bunker, a field deputy medical investigator for Otero County, interviewed Wheeler and Defendant in connection with the investigation. Both Wheeler and Defendant initially informed Bunker that they had placed Shelby to sleep in a bassinette. When Bunker inspected the home, however, she could not find a bassinette, but she did find the drawer filled with soft bedding. Bunker testified that she became concerned about the drawer because “[t]he sleeping conditions — the baby was placed in a drawer on blankets that were placed inside the drawer. The drawer was— in my opinion — not wide enough or long enough for an infant to move around freely.” Wheeler and Defendant subsequently admitted that Shelby had been sleeping in the drawer on the night that she died. {62} Pamela Wong, a social worker supervisor with the investigations unit for the Children, Youth and Families Department (Department), also testified about Shelby’s sleeping environment. She explained that the Department understands poverty. We understand the difference between poverty and neglect. There are normally sleeping spaces for children, whether it’s a bed or a crib or a bassinette. Generally, those items are in homes for children to sleep on. Pallets on the floor, perhaps. Normally, you don’t see an infant sleeping in a drawer. Wong testified that based on her training and experience, the drawer in which Shelby had been placed to sleep was inappropriate for a child of Shelby’s age and size because “there was [not] adequate room in that particular drawer for a five-month-old child.” {63} At trial, the State admitted into evidence a videotape depicting the drawer in the condition in which it was found by the police on the day that Shelby died. From this videotape, it appears that the drawer was filled to overflowing with soft bedding. Indeed, large blankets or sheets can be seen spilling out of the drawer onto the floor. Additionally, it reasonably could be inferred that the bottom of the drawer was lined with a pillow, which may have been intended to serve as a make-shift mattress. The videotape, as well as the drawer and the blankets, was admitted into evidence and, therefore, was available to the jury for visual inspection during their deliberations. {64} Doctor Ross Reichard, a forensic pathologist with the Office of the Medical Investigator, was unable to determine the cause and manner of Shelby’s death based on his post-mortem examination of her physical condition. Dr. Reichard testified that although there was no external evidence of physical trauma, he could not exclude the possibility that Shelby had suffocated to death because based on our investigation, the decedent had been sleeping in a small drawer with a fixed wall, just like a regular dresser drawer, with a pad and a blanket. And, so, one of our concerns in small children is their inability to move and free themselves if they’re to get into a situation where their airway may be obstructed. So, a soft material may [occlude] their airway. Their face may be between, say, the solid drawer, there may be a blanket or a pillow over which [there was] — based on our investigation, those were likely present. And, that may have resulted in the child re-breathing the same air, which can then lead to their death. Unfortunately, there are limits to modern medicine and pathology as well, and one of those is that there’s certain things that we can’t determine, based on the autopsy. So, for example, if the airway is occluded or the — there’s some sort of obstruction to the breathing, we would not necessarily find any evidence of that on the autopsy. And, so, based on our investigation, we felt that those things were worrisome enough for us that the death was best classified as an undetermined cause, and, therefore, undetermined manner of death. Dr. Reichard further explained that “[die-pending on the circumstances it can be relatively easy for a child to suffocate at that age,” and that the magnitude of the risk depends on “the size and the surrounding environment and the placement of the infant.” Based on Shelby’s size, the size of the drawer, and the amount of soft bedding inside the drawer, Dr. Reichard testified that, in his opinion, there was a reasonable possibility that Shelby’s sleeping environment posed a risk of danger to her life or health. {65} Aside from suffocation, the other possible cause of Shelby’s death was Sudden Infant Death Syndrome (SIDS). Dr. Reichard explained that SIDS is a category of deaths that occur in children that are typically older than one month of age, and less than six months, and most of them occur between the ages of one month and four months of age. And, what this is, is a classification that after — of the death — that after a complete autopsy, including a scene investigation, you find no explanation for their deaths. So, it’s a way of categorizing a group of deaths that occur in children, in a relatively specific time frame. And, it’s felt to be a natural death, although no exact explanation for why their death is currently known. Dr. Reichard testified that to reduce the occurrence of SIDS, the Back to Sleep campaign encourages parents to put their children to sleep on their backs, and that since this campaign first started in the early 1990s there has been a decrease in the number of SIDS-related deaths. Shelby’s death, however, could not be classified as a SIDS-related death because of the reasonable possibility that she had died from suffocation. {66} Defendant offered the expert testimony of Doctor Chrisley Sparing, a forensic pathologist and Chief Medical Examiner for the state of Georgia. Dr. Sparing agreed with Dr. Reichard that the cause and manner of Shelby’s death could not be determined based on the results of the autopsy because “[w]e know as pathologists that little babies could be suffocated, and leave no mark on them whatsoever,” and in the present case, there was no “physical evidence from the autopsy to prove or disprove that something like a pillow or a blanket or excess bedding caused the child’s death, or that this is just crib death [SIDS].” Additionally, Dr. Sparing agreed with Dr. Reichard that “infants can be suffocated, you know, rapidly, within just a few minutes,” and that based on Shelby’s age and size, the size of the drawer, and the amount of soft bedding inside of the drawer, there was a reasonable possibility that her sleeping environment posed a danger to her life or health. Specifically, [i]f the child became entrapped, especially between the bedding — maybe turned and was up and fell or became lodged in between the bedding and the edge of the inner lining of the drawer, it’s possible that this could interfere with the child’s ability to breathe and the child could possibly suffocate. I have to say in my career, I’ve never seen a child that suffocated in a drawer before. I can’t tell you it’s impossible, but it’s — I mean, all I can say is this possibility exists, although I would say it would be relatively uncommon. Could it happen? Sure. But, that’s the best that I can really say. {67} Construing the foregoing evidence in the light most favorable to the jury’s verdict, I believe that it was sufficient to support the jury’s factual finding that Defendant’s conduct posed a substantial and foreseeable risk to Shelby’s life or health. Bunker, Wong, Dr. Reiehard and Dr. Sparing all testified that the drawer was an inappropriate sleeping environment for an infant of Shelby’s age and size. Indeed, both Dr. Reiehard and Dr. Sparing agreed that it is very easy for a five-month-old infant to suffocate and that suffocation can occur in a matter of mere minutes. Additionally, they both agreed that in light of Shelby’s age and size, the size of the drawer, the excessive amount of soft bedding, and Shelby’s prone sleeping position, Shelby’s sleeping environment posed a risk of danger of suffocation. Accordingly, the evidence was sufficient for the jury reasonably to find that Defendant’s conduct placed Shelby in a situation “that may endanger [her] life or health” contrary to Section 30-6-l(D)(l). {68} The majority concludes, however, that the evidence was insufficient to prove that the risk of danger to Shelby’s life or health was substantial and foreseeable. I respectfully disagree. As the majority acknowledges, the risk of death by suffocation is a “substantial injury” of the type “contemplated by our endangerment statute.” Given the severity of the harm and the ease with which infants may suffocate, parents are on notice that they must be vigilant in their care and supervision of infants. Indeed, it is common knowledge that many everyday household items that pose no risk of harm to adults, i.e., plastic bags and items small enough to fit within a child’s mouth, pose a unique and significant risk of harm to infants, namely, the risk of death by suffocation. Furthermore, consistent with the expert testimony in the present case, it is common knowledge that infants are particularly vulnerable to the risk of suffocation while sleeping and that this risk is heightened when any of the following factors are present: (1) a soft sleeping surface, (2) a prone sleeping position, (3) a confined space with fixed walls in which the infant is unable to move about freely, and (4) soft items that may block the infant’s nose and mouth. In the present case, all of these risk factors were present and, therefore, the jury reasonably could have found that they heightened the risk of suffocation to an unreasonable and intolerable degree. In light of the severity of the harm and the ease and speed with which the harm may occur, it defies logic and experience to characterize this risk as anything less than substantial and foreseeable. {69} The majority opinion concludes, however, that no rational juror could have found that the risk of harm to Shelby was anything more than a remote possibility in light of Dr. Sparing’s testimony. I disagree. First, I note that the jury was not required to credit Dr. Sparing’s expert testimony, even if uncontradicted. See State v. Jason F., 1998-NMSC-010, ¶ 29, 125 N.M. 111, 957 P.2d 1145; see also State v. Moore, 42 N.M. 135, 160, 76 P.2d 19, 34 (1938) (“The judgments of experts or the inferences of skilled witnesses, even when unanimous and uncontroverted, are not necessarily conclusive on the jury, but may be disregarded by it.”). Second, as the following discussion demonstrates, the majority fails to construe Dr. Sparing’s testimony in the light most favorable to the jury’s verdict. {70} The record reflects the following colloquy between Dr. Sparing and defense counsel with respect to the possibility that Shelby had suffocated on soft bedding: [Defense Counsel]: And, if it did happen, how would you characterize that, as to cause and manner of death? [Dr. Sparing]: That would be an accident. I would call it suffocation, and how it occurred is suffocated in bed clothes within drawer. That would be considered to be an accidental death. [Defense Counsel]: Why not homicide if someone puts blankets in there? [Dr. Sparing]: Because— [Defense Counsel]: (Inaudible) expertise? [Dr. Sparing]: Because, basically, for an accident, we consider that — the terminology we use is “unpredictable,” “unforeseen,” and “unknown.” Basically, a reasonable individual would not look at an environment like this and consider the child to be at risk. It’s a drawer with blankets and bedding in it to sleep in.... But, things can happen, and result in the child being dead. And, it’s not predictable. It’s not to say that, you know, you should never, ever, ever do this. But, the risk, albeit small, exists. And, because it’s unpredictable and unforeseen, then we consider those to be accidents. No one intended for such a death to occur. But, accidents happen in all sorts of different ways. On redirect examination, defense counsel clarified Dr. Sparing’s testimony with respect to the manner of death if an infant suffocates on soft bedding. [Defense Counsel]: And, you talked about the fact that people are told not to put their infants on soft bedding. If parents do that, is that a homicide? [Dr. Sparing]: I’ve never seen — seen that rule[d], a homicide, or had a case like that come to my office or under my supervision. [Defense Counsel]: Well, why isn’t it — if parents should know better? [Dr. Sparing]: There’s a difference between a risk that is very, very small and hypothetical, and all those unmeasurable, versus that we know carries a great deal of risk. I mentioned car seats earlier. We know that if you put an infant in a car seat and strap it in, strap that car seat in, and there’s a head-on collision, more likely than not, that infant is going to survive and be okay. If it’s not in a car seat, if it’s sitting in mama’s lap, or the car seat isn’t strapped in, and there’s a head-on collision, the injuries are catastrophic, even fatal, more often than not. That is something we know, very, very, very clearly. That’s why car seats are very, very important. But, bedding, when it comes down to it, there are certain situations where, I think, like, say on a water bed. We know now that putting children on soft water beds, infants on soft water beds face down, could potentially kill them. Does it kill all of them? No. A very, very, tiny number. Maybe one out of a thousand. One out of two or three thousand, something like that. But, it’s something that potentially can happen. That doesn’t mean that you should never, ever, ever, say, put a child on soft bedding because that’s where you want a child, in soft bedding. But, there’s a tiny risk that exists that most of the time is pretty much unpredictable. And, because it’s speaking of a tiny risk that’s unpredictable, versus a large risk like a car seat issue that is very, very predictable, that’s why recommendations are very difficult to make, as far as where you put your baby to sleep. Do you put them on a naked mattress? No, you don’t want to do that. You want the child comfortable so it will sleep, but covered up and taken care of. And, the vast majority— you know — ninety-nine point nine nine ... percent, grow up and do just fine. {71} As the foregoing summary reflects, Dr. Sparing testified that if an infant suffocates to death on soft bedding, he would categorize the manner of death as an accident, rather than a homicide, even if the parents should have known better, because an accident is “unpredictable,” “unforeseen,” and “unknown.” In the present case, it is undisputed that Shelby’s death, if attributable to her sleeping conditions, was nothing short of a tragic accident. Nonetheless, accidental harm is not excluded from the purview of Section 30-6-l(D)(l), which explicitly provides that “[a]buse of a child consists of a person ... negligently, and without justifiable cause, causing or permitting a child to be ... placed in a situation that may endanger the child’s life or health.” (Emphasis added.) {72} This is not to say, however, that mere negligence is sufficient to sustain a conviction of negligent child abuse. As this Court previously has observed, “the child abuse statute contains no indication that the legislature intended felony punishment to attach to ordinary negligent conduct” under Section 30-6-1(D). Santillanes v. State, 115 N.M. 215, 223, 849 P.2d 358, 366 (1993). Indeed, if “ ‘imprudent and possibly negligent’ conduct were sufficient to expose a care giver to criminal liability for child endangerment, ‘undoubtedly the majority of parents in this county would be guilty of child endangering — at least for acts of similar culpability.’ ” State v. Massengill, 2003-NMCA-024, ¶ 46, 133 N.M. 263, 62 P.3d 354 (quoting State v. Massey, 128 Ohio App.3d 438, 715 N.E.2d 235, 238-39 (Ct.App.1998)). Accordingly, the State is required to prove that the defendant acted with criminally negligent intent, that is, that “the defendant knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child.” Santillanes, 115 N.M. at 222, 849 P.2d at 365. {73} In the present case, the evidence was sufficient to prove that Defendant’s conduct was criminally negligent. The jury reasonably could have inferred that Defendant acted with reckless disregard with respect to the risk of harm to Shelby by choosing a drawer that was too small for Shelby’s size, placing a soft pillow on the bottom of the drawer, placing Shelby to sleep face-down on her stomach, and covering her head-to-toe with an excessive amount of soft bedding. Defendant could have used a larger drawer or a laundry basket as a make-shift bassinette or alternatively, he could have procured a crib from his mother in Carizzozo. Indeed, the evidence established that Defendant was in Carizzozo on the night that Shelby died, but that he did not bother to stop by his mother’s house to pick up a crib for his infant daughter. Additionally, Defendant could have placed Shelby to sleep on her back, used less soft bedding, or arranged the bedding more loosely, all of which would have reduced the risk of harm to Shelby’s life or health. Defendant, however, did not do any of these things. {74} Although the State was not required to prove that Defendant actually was aware of the risk of harm, evidence existed from which the jury reasonably could have inferred consciousness of guilt. It is well established that lying to the police about the circumstances surrounding a crime or an accident evidences “a consciousness of guilt that would allow the [trier of fact] to find a level of awareness on Defendant’s part that his actions were likely to cause harm.” State v. Worrick, 2006-NMCA-035, ¶ 9, 139 N.M. 247, 131 P.3d 97; see also State v. Faubion, 1998-NMCA-095, ¶ 13, 125 N.M. 670, 964 P.2d 834 (holding that the defendant’s “lies and misleading actions” are evidence of consciousness of guilt). Defendant initially lied to Bunker, informing her that Shelby had been sleeping in a bassinette on the night that she died. The jury reasonably could have inferred that Defendant lied about Shelby’s sleeping environment because he was aware that this environment posed a substantial and foreseeable risk of harm to Shelby’s life or health. {75} For the foregoing reasons, I believe that the evidence was sufficient to support Defendant’s conviction of negligent child abuse contrary to Section 30-6-1 (D)(1) with respect to Shelby. I therefore respectfully dissent.